
# IN THE SUPREME COURT OF GUAM

**PEOPLE OF GUAM,**
Plaintiff-Appellee,

**v.**

**MICHAEL ANTHONY LIBBY,**
Defendant-Appellant.

Supreme Court Case No. CRA20-007
Superior Court Case No. CF0349-19

## OPINION

## Cite as: 2021 Guam 27

Appeal from the Superior Court of Guam
Argued and submitted on August 23, 2021
Via Zoom video conference

Appearing for Defendant-Appellant:
Braddock J. Huesman, *Esq.*
Fisher Huesman P.C.
Core Pacific Bldg.
545 Chalan San Antonio, Ste. 302
Tamuning, GU 96913

Appearing for Plaintiff-Appellee:
Richelle Y. Canto, *Esq.*
Assistant Attorney General
Office of the Attorney General
Prosecution Division
590 S. Marine Corps Dr.
Tamuning, GU 96913



**E-Received**
12/23/2021 1:12:27 PM

BEFORE: F. PHILIP CARBULLIDO, Chief Justice; ROBERT J. TORRES, Associate Justice; KATHERINE A. MARAMAN, Associate Justice.

**CARBULLIDO, C.J.:**

[1]     Defendant-Appellant Michael Anthony Libby appeals his convictions for Burglary (As a Second-Degree Felony), Attempted Burglary (As a Second-Degree Felony), Theft of Property (As a Second-Degree Felony), and Attempted Criminal Trespass (As a Misdemeanor).  On appeal, Libby argues the trial court violated his right to effective assistance of counsel under the Sixth Amendment by improperly denying his request for new counsel.  Libby further contends the trial court deprived him of a fair trial by questioning a witness and by making certain remarks, which he alleges were improper.  We disagree and affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

[2]     Libby was charged with Burglary (As a Second-Degree Felony), Attempted Burglary (As a Second-Degree Felony), Theft of Property (As a Second-Degree Felony), Attempted Criminal Trespass (As a Misdemeanor), Criminal Trespass (As a Misdemeanor), and Attempted Theft (As a Petty Misdemeanor).[1]  The People of Guam ("People") dismissed the latter two charges, Criminal Trespass (As a Misdemeanor) and Attempted Theft (As a Petty Misdemeanor).

[3]     Libby asserted his right to a speedy trial.  Just before jury selection and trial, defense counsel informed the trial court that Libby was unhappy with his representation and that Libby wanted to personally address the court.  Libby addressed the trial court and requested

---

[1] The charges for Burglary (as a Second-Degree Felony) and Theft of Property (as a Second-Degree Felony) relate to properties belonging to Shaomi Shi, while the charges for Attempted Burglary (as a Second-Degree Felony) and Attempted Criminal Trespass (as a Misdemeanor) relate to property belonging to Konstantine Dietrich.

appointment of new counsel. Following the request, the trial court excused the attorneys and

conducted a private *Nguyen*[2] inquiry with Libby:

>       THE COURT: . . . . Mr. Libby, the reason I asked the attorneys to leave
> the courtroom is so that you can speak freely –
>
>       . . . .
>
>       THE COURT: -- to the Court about your concerns. Okay? And I will ask
> you some questions about that in order to make that decision on your request. So
> go ahead. Tell me why you want to.
>
>       MR. LIBBY: First of all, lack of interest, Your Honor. Every time we
> meet I bring up discrepancies that I find in my own discoveries.
>
>       . . . .
>
>       MR. LIBBY: And we talk about it and he says that it doesn't matter to --
>
>       . . . .
>
>       THE COURT: All right. Okay. And is that because he says don't talk to
> me about it or you've given him the details and then he gives you a response to
> that?
>
>       MR. LIBBY: Yes, I give him details and he says it doesn't matter.
>
>       . . . .
>
>       THE COURT: . . . . And then how many times have you met with your
> attorney?
>
>       MR. LIBBY: I would say -- I'm not exactly sure but since I asserted my
> speedy trial, about, like, maybe from a range four to seven times.
>
>       THE COURT: Four to seven times? Okay. And where would these
> meetings occur?
>
>       MR. LIBBY: Got to get in the lockup, Your Honor.
>
>       THE COURT: Okay. Alright. What other reasons do you have for --

---

[2] This is a reference to *United States v. Nguyen*, 262 F.3d 998, 1001 (9th Cir. 2001). The trial court referred to a trial court's duty to evaluate a request for counsel as the "*Nguyen* inquiry."

MR. LIBBY:  I've requested for my discoveries on the evidence that they have against me and he says that he cannot provide it to me.  He hasn't prepped me for this trial, which --

THE COURT:  Okay.  When you say you've requested for discovery, what do you mean by you've requested for discovery?

MR. LIBBY:  On all the evidence that they say they have against me.

THE COURT:  Okay.  Have you been in the system before?

MR. LIBBY:  Yes, Your Honor.

THE COURT:  Okay.  So you know what discovery is --

MR. LIBBY:  Yes.

THE COURT:  -- right?  Police reports and things like that -- the evidence against you.  So, did he not give you a copy of the discovery that was provided to him by the Attorney General's Office?

MR. LIBBY:  Yes.

. . . .

THE COURT:  Okay.  So there are other items that were not in that packet that you think he should provide to you?

MR. LIBBY:  Yes.

THE COURT:  Did he give you a reason why he couldn't provide it?

MR. LIBBY:  No, he just told me that I will not see that until we go to the day of trial.

THE COURT:  Okay.  When you say we will not see that, are we talking about physical evidence, like, for instance, a screwdriver?  Is that what you're asking to --

MR. LIBBY:  Pictures of the evidence I brought to his attention.

. . . .

THE COURT:  Did he say he doesn't have it or that he's not able to provide it to you?

MR. LIBBY:  No, he just specifically told me that I won't get those until trial.

THE COURT:  Okay.  Can you remember when you asked him about the pictures?

MR. LIBBY:  The exact dates I'm not sure, Your Honor, but I've been bringing it to his attention every time I see him.

THE COURT:  Okay.  All right.  And is there anything else?

MR. LIBBY:  And he just told me he has no confidence in this case.

THE COURT:  Okay.  Well, again, that's coming from the lawyer's words to you and I'm sure there's more to it than that when a lawyer says that.  And I don't know the context in what he's saying that, but he's -- the lawyer has an obligation to give you his best legal advice and what he sees as your best and worst case scenarios, right?

MR. LIBBY:  Yes.

. . . .

THE COURT:  . . . . Is there anything else that you --

MR. LIBBY:  Yes.  And he -- you know, when I waived my speedy trial [right] the first time, I didn't meet with him only until I asserted it. . . .  And the only time I have seen him constantly is only when I asserted my speedy trial.

THE COURT:  Right.

MR. LIBBY:  But when he does come to meet me it's like I'm literally being forced to waive my speedy trial . . . .

. . . .

MR. LIBBY:  -- it's not like he's asking, it's just like that's what his main topic is --

THE COURT:  Okay.

MR. LIBBY:  -- is for me to waive it.

THE COURT:  Well, that's -- the decision on whether or not to waive a speedy trial is also tactical, right?  Meaning it's based on a reason to achieve something.  And a lot of times lawyers ask their clients -- I'm not sure how your

lawyer asked you -- but they ask their clients if they can waive their speedy trial rights so they [sic] that it gives them time to prepare for trial, right. . . .

. . . . [I]s there any other issues that you have with the attorney?

MR. LIBBY:  No, Your Honor. . . .

Transcript ("Tr.") at 3-9 (Pre-trial Hr'g, Dec. 28, 2020).

[4]     The trial court then invited the attorneys back into the courtroom and questioned defense counsel on the issues raised by Libby:

THE COURT:  . . . . And does the defense have photographs that may have been referenced in discovery?

MR. BISCHOFF:  Yes, we have some photographs that I received on Friday.

THE COURT:  Have you shared that with your client?

MR. BISCHOFF:  I went to see him, try to see him yesterday afternoon to show him these, but he didn't want to see me.

. . . .

THE COURT:  Okay.  Mr. Bischoff, you had discussions with your client up until Friday of last week?

MR. BISCHOFF:  No, until yesterday morning.

THE COURT:  And how many times have you met with your client in preparation for the defense?

MR. BISCHOFF:  A dozen, 15 times -- maybe more.

THE COURT:  . . . [I]n the course of your meeting with your client, were you able to discuss the state of the case and the evidence against him?

MR. BISCHOFF:  Oh, yes, of course we discussed that each time.

. . . .

THE COURT:  Okay.  And based on those discussions, you were able to, as best you can with his assistance, present a defense?

MR. BISCHOFF: Because I've advised him, it's not a very good case. It's not a very good case at all.

. . . .

THE COURT: But your relationship is a working relationship that can -- that he raises his concerns about the case against him and his potential defenses?

MR. BISCHOFF: I believe so, unless he sees it otherwise.

*Id.* at 10-12.

[5]    After conducting the inquiry, the trial court denied Libby's request for new counsel, finding the inquiry did not demonstrate a complete breakdown in the attorney-client relationship. The trial court then proceeded with jury selection and trial.

[6]    During trial, the People called Guam Police Department ("GPD") Officer Craig Peter Camacho Calvo. Officer Calvo testified that he responded to a report of a burglary at a home in Villa Isabana. As he approached the home, Officer Calvo saw a male individual, later identified as Konstantine Dietrich, running after another individual dressed in dark clothing. When Officer Calvo exited his vehicle, he assisted other law enforcement officers already on scene in restraining the individual dressed in dark clothing.

[7]    Officer Calvo testified that Dietrich confirmed that the individual dressed in dark clothing—who identified himself as Libby to law enforcement—tried to break into his home. Officer Calvo also testified that, when he arrested and searched Libby, he discovered and confiscated various jewelry and tools in his pocket. Officer John Junior T. Flores, who was with Officer Calvo, testified the following items were retrieved and confiscated from Libby's pockets during the search: a silver Omega De Ville brand watch; a gold Cartier brand ring; two silver bracelets; a gold necklace with an oval pendant; a silver and gold necklace; Marlboro brand

cigarettes; a flat-head screwdriver; an Energizer brand flashlight; a white Samsung brand phone;

and two red envelopes containing forty dollars in cash.

[8]      On cross-examination, defense counsel asked Officer Calvo about Libby's arrest:

Q      [W]hen you took items from [Libby's] pocket, Mr. Dietrich was right there?

A      I don't recall Mr. Dietrich was right there, because as I stated earlier, I escorted Mr. Libby to my patrol vehicle.

. . . .

Q      And, how come none of the [officers] takes a video of the arrest, of the taking of items from [Libby], how come nobody takes out their IPhone, you know, and just take some video on what's going on?

A      When -- I'm sorry.  GPD is not equipped with, as far as patrol is concerned, we're not equipped with surveillance to record our actions.

Tr. at 39-40 (Jury Trial, Sept. 11, 2019).

[9]      After further cross-examination, the trial court questioned Officer Calvo and had the

following exchange with defense counsel:

THE COURT:  I'm going to let the witness answer the question.  What happens when you record an arrest through your phone?

[CALVO]:  That would be confiscated as evidence.

THE COURT:  That's what happens.

MR. BISCHOFF:  Oh, the phone --

THE COURT:  The phone gets taken by Guam Police Department, which probably explains why the officers don't record an arrest.

MR. BISCHOFF:  Well, if I could follow up on that then, would they --

THE COURT:  I just don't want to leave the jury with a false impression that the officers don't want to record.

MR. BISCHOFF:  No, I don't want to leave anybody --

THE COURT:  It's just not practical and --

MR. BISCHOFF:  I don't want anybody making false impressions.

THE COURT:  And the other thing is -- I'm sorry, counsel, I didn't mean to say "false impression," but an impression that these officers didn't want to record, if they're allowed to record, they would.

The fact that there is a general order suggests that it's not willy-nilly that there is a policy and a procedure by which it's done.  You don't just take out your phone and start recording, you follow department procedures.  And if he deviated from that procedure, he would be taken to task for that.

. . . .

THE COURT:  My job, ladies and gentlemen, is to make sure that you get balanced presentation of the evidence when it's necessary.  I rarely step in, but I think that that's an important thing to do today.

*Id.* at 43-45.

[10]     Officer Teodoro S. Parinasan, Jr. also responded to the report of a burglary at Villa Isabana and testified at trial.  Officer Parinasan stated that he met with Dietrich, the individual running after Libby, at his home after he returned from speaking with other officers.  Officer Parinasan testified that Dietrich informed him that he saw an individual closing a window to his home from the outside before running away.  Officer Parinasan inspected the outside portion of a kitchen window in Dietrich's home and saw a metal-framed window screen leaning near the base of the wall and marks on the glass of the kitchen window.

[11]     Shaomin Shi, another resident of Villa Isabana, testified about a separate incident in her home.  Shi stated she was alerted by her neighbor of a break-in in the neighbor's home and that the neighbor asked Shi if her home was also broken into.  Shi testified she looked around her home, noticed that some jewelry and money were missing, and called GPD.  When law enforcement arrived at Shi's home and inspected the premises, Shi learned her kitchen window was unlocked, and there were marks on the outside portion of a screen window.  Shi stated she

later provided GPD with an inventory of the items missing from her home, along with some photos. During trial, Shi identified the jewelry, red envelopes containing cash, and cigarettes retrieved and confiscated from Libby's pockets as the items taken from her home. Shi also testified about surveillance footage, which was admitted and published to the jury, showing an individual breaking into her home.

[12]     After the close of the People's case, Libby moved for a directed verdict of acquittal on the charges relating to Dietrich's residence, specifically, Attempted Burglary (As a Second-Degree Felony) and Attempted Criminal Trespass (As a Misdemeanor). Upon hearing arguments, the trial court denied the motion. The court then provided its final instructions to the jury, which included an instruction that statements made by the court or questions posed to witnesses were not evidence. The jury deliberated and returned guilty verdicts against Libby on all charges in the amended indictment. The trial court sentenced Libby to serve ten years at the Department of Corrections with credit for time served. Following entry of judgment, Libby timely appealed.

## II. JURISDICTION

[13]     This court has jurisdiction over appeals from a final judgment of conviction entered by the Superior Court of Guam. *See* 48 U.S.C.A. § 1424-1(a)(2) (Westlaw through Pub. L. 117-57 (2021)); 7 GCA §§ 3107(b), 3108(a) (2005); 8 GCA §§ 130.10, 130.15(a) (2005).

## III. STANDARD OF REVIEW

[14]     We review the denial of a motion or request for substitution of counsel for abuse of discretion. *United States v. Nguyen*, 262 F.3d 998, 1004 (9th Cir. 2001) (citing *United States v. Corona-Garcia*, 210 F.3d 973, 976 (9th Cir. 2000), *cert. denied*, 531 U.S. 898 (2000)).

[15]     When a defendant fails to object to an alleged error at trial, we review for plain error. *People v. Quitugua*, 2009 Guam 10 ¶¶ 10-11; *see also United States v. Morgan*, 376 F.3d 1002 (9th Cir. 2004) (reviewing for plain error an unobjected allegation of improper trial participation by judge).  Under plain error review, "[w]e will not reverse unless (1) there was an error; (2) the error is clear or obvious under current law; (3) the error affected substantial rights; and (4) reversal is necessary to prevent a miscarriage of justice or to maintain the integrity of the judicial process." *Quitugua*, 2009 Guam 10 ¶ 11.

## IV.  ANALYSIS

### A.  Libby's Request for New Counsel

[16]     Libby's first argument concerns the denial of his request for new counsel.  *See* Appellant's Br. at 3 (Feb. 19, 2021).  Libby contends the trial court abused its discretion in denying his request, thereby violating his right to effective assistance of counsel under the Sixth Amendment.  *Id.* at 13.  In response, the People argue the trial court conducted an adequate inquiry following Libby's request, which created a sufficient basis for its proper denial. Appellee's Br. at 13-14 (Apr. 12, 2021).  While we agree with the People, we first address Libby's suggestion that his Sixth Amendment right to counsel was violated when he was not provided counsel for the inquiry.

#### 1.  Right to counsel under the Sixth Amendment

[17]     The Sixth Amendment to the U.S. Constitution, incorporated and made applicable to Guam through the Organic Act, provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI; 48 U.S.C.A. § 1421b(g), (u) (Westlaw through Pub. L. 117-57 (2021)).  "The right to counsel is necessarily 'the right to the effective assistance of counsel.'"  *People v. Titus*, 2020 Guam 16 ¶

19 (per curiam) (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)). "This right applies at all critical stages of the proceedings . . . ." *Id.* (citing *Lee v. United States*, 137 S. Ct. 1958, 1964 (2017)). While the constitutional guarantee of counsel is a fundamental right, a defendant is "not entitled to a particular lawyer with whom he can, in his view, have a 'meaningful attorney-client relationship.'" *United States v. Moore*, 159 F.3d 1154, 1158 (9th Cir. 1998) (quoting *Morris v. Slappy*, 461 U.S. 1, 3-4 (1983)). Rather, a defendant is entitled to adequate and "conflict free representation under the Sixth Amendment." *Id.* at 1157.

[18]     Determining whether a defendant is denied conflict free representation rests on showing an actual conflict of interest, i.e., "the existence of competing interests potentially affecting counsel's capacity to give undivided loyalty to his client's interest," or of an irreconcilable conflict. *Id.* at 1158. Regarding the latter, which is the subject of this appeal, if a defendant and his attorney are embroiled in an irreconcilable conflict, refusal to allow substitution of the attorney may result in denial of the right to effective assistance of counsel under the Sixth Amendment. *United States v. McClendon*, 782 F.2d 785, 789 (9th Cir. 1986) (citing *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970)). This is because a defendant is constructively denied counsel when he has, "with legitimate reason, completely lost trust in his attorney, and the trial court refuses to remove the attorney." *United States v. Velazquez*, 855 F.3d 1021, 1033-34 (9th Cir. 2017); *see also Moore*, 159 F.3d at 1158 ("[I]f the relationship between lawyer and client completely collapses, the refusal to substitute new counsel violates [a defendant's] Sixth Amendment right to effective assistance of counsel.").

### 2.  The *Nguyen* inquiry

[19]     When a criminal defendant moves to substitute counsel, a trial court "must balance the defendant's Sixth Amendment right to counsel against the government's interest in the prompt

and efficient administration of justice." *United States v. Gonzalez*, 113 F.3d 1026, 1028 (9th Cir. 1997). But "[b]efore the [trial] court can engage in a measured exercise of discretion, it must conduct an inquiry adequate to create a 'sufficient basis for reaching an informed decision.'" *Id.* (quoting *United States v. D'Amore*, 56 F.3d 1202, 1205 (9th Cir. 1995), *overruled on other grounds by United States v. Garrett*, 179 F.3d 1143 (9th Cir. 1999)).

[20]     The trial court referred to this inquiry as a "*Nguyen* inquiry." Tr. at 3 (Pre-trial Hr'g, Sept. 11, 2019); *see also Nguyen*, 262 F.3d at 1000-01. In *United States v. Nguyen*, 262 F.3d 998 (9th Cir. 2001), the Ninth Circuit considered whether a trial court properly denied a defendant's motion for substitute counsel. 262 F.3d at 1002. The Ninth Circuit reversed, holding that denial of the motion was an abuse of discretion because it deprived the defendant of his Sixth Amendment right to counsel. *Id.* at 1004-05. Along with providing factors for an appellate court to consider in reviewing a denial of a motion for substitution of counsel, the Ninth Circuit explained: "For an inquiry regarding substitution of counsel to be sufficient, the trial court should question the attorney or defendant 'privately and in depth,' and examine available witnesses." *Id.* at 1004 (quoting *Moore*, 159 F.3d at 1160).

[21]     *Hudson v. Rushen*, 686 F.2d 826 (9th Cir. 1982), involved a California state prisoner's habeas corpus petition. The court explained that the Sixth Amendment inquiry is necessary as it "might ease [a] defendant's dissatisfaction, distrust, and concern." *Id.* at 829 (citing *Brown*, 424 F.2d at 1170). To conduct the Sixth Amendment inquiry, California courts have adopted the "*Marsden* rule," which provides that "a trial court must permit a defendant seeking a substitution of counsel after the commencement of the prosecution's case to specify the reasons for his request." *Id.* (citing *People v. Marsden*, 465 P.2d 44 (Cal. 1970) (in bank)). The *Marsden* rule

also requires the trial court to determine whether further inquiry is necessary or if such reasons form an adequate basis for granting the motion. *Id.*

[22]    During the Sixth Amendment inquiry, the trial court "may need to evaluate the depth of any conflict between defendant and counsel, the extent of any breakdown in communication, how much time may be necessary for a new attorney to prepare, and any delay or inconvenience that may result from substitution." *United States v. Adelzo-Gonzalez*, 268 F.3d 772, 777 (9th Cir. 2001). To do so, the trial court may ask open-ended questions, but specific and targeted questions are preferred in order to probe the extent of any breakdown in the attorney-client relationship. *Id.* at 777-78. In some cases, it is necessary to "explore other sources," *id.* at 778, such as available witnesses, to verify any accusations made by a defendant against his attorney. *See Gonzalez*, 113 F. 3d at 1028. These practices help ensure the trial court "conduct[s] an inquiry adequate to create a 'sufficient basis for reaching an informed decision'" on a defendant's motion for substitute counsel. *Id.* (quoting *D'Amore*, 56 F.3d at 1205).

### 3.  Separate counsel was not required for the *Nguyen* inquiry

[23]    Libby argues he "was and is entitled to counsel at every critical stage of the proceedings against him and there should be no question that representation at a hearing on replacing one's own attorney is critical." Appellant's Br. at 15. Libby later conceded that he was not necessarily entitled to separate counsel before the trial court could hear his request and that he raised the issue to point out (1) defense counsel's continuing professional obligation to represent him, and (2) counsel's supposed deficiency in failing to move for substitution of counsel on his behalf. *Id.* at 16. To be clear, the trial court was not required to appoint Libby separate counsel to represent him during the *Nguyen* inquiry.

[24]     The Sixth Amendment guarantees a defendant the right to the effective assistance of counsel at all critical stages of a criminal proceeding, which is "any 'stage of a criminal proceeding where substantial rights of a criminal accused may be affected.'" *Hovey v. Ayers*, 458 F.3d 892, 901 (9th Cir. 2006) (quoting *Mempa v. Rhay*, 389 U.S. 128, 134 (1967)); *see also Titus*, 2020 Guam 16 ¶ 19.  However, in suggesting that an inquiry by a trial court to consider a *pro se* request for new counsel constitutes a critical stage, Libby offers no controlling authority. Instead, Libby directs the court to *United States v. Wadsworth*, 830 F.2d 1500 (9th Cir. 1987), in which the Ninth Circuit determined that the proceedings conducted by a trial court regarding the defendant's motion for substitution of counsel and a continuance resulted in the denial of the defendant's rights to due process and to counsel.  830 F.2d at 1510.

[25]     As the People appropriately argue in response, Libby is unlike the defendant in *Wadsworth* because the trial court there considered a situation whereby defense counsel "had taken an adversary and antagonistic position on a matter concerning his client's right to counsel." *Id.* at 1511.  Here, nothing in the record shows defense counsel took an adversarial or antagonistic stance against Libby on his request for new counsel.  Rather, defense counsel assisted Libby by alerting the trial court that Libby wanted to address certain concerns about his representation.  Further, in *LaGrand v. Stewart*, 133 F.3d 1253 (9th Cir. 1998), the Ninth Circuit recognized that trial courts are not prohibited from hearing *pro se* motions for substitution of counsel and explained:

> A motion to replace a criminal defendant's trial counsel admittedly creates a delicate situation for the lawyer, the defendant and the court.  But bringing in a new lawyer is not required to protect the defendant's rights.  The obligation of the trial court to inquire is by now well known, and an appropriate inquiry made by the trial judge will disclose whether the relationship has deteriorated to the point that communication has been destroyed.  The defendant's self-interest and his lawyer's continuing professional obligation are sufficient to enable the trial court to make the necessary determination.

133 F.3d at 1277. Based on *LaGrand* and the circumstances presented here, the trial court did not have to appoint Libby separate counsel for the *Nguyen* inquiry.

### 4. The trial court's denial of Libby's request was not an abuse of discretion

[26]     Having determined that separate counsel was not required during the *Nguyen* inquiry, we next address whether the trial court abused its discretion in denying Libby's request for new counsel. In reviewing the denial of a request or motion for new counsel, we consider three factors: "(1) the adequacy of the court's inquiry into the defendant's complaint, (2) the extent of conflict between the defendant and counsel, and (3) the timeliness of the motion and the extent of resulting inconvenience or delay." *United States v. Cassel*, 408 F.3d 622, 637 (9th Cir. 2005); *see also Nguyen*, 262 F.3d at 1004.

### a. Adequacy of the inquiry

[27]     The first factor we consider is whether the trial court "conduct[ed] an inquiry adequate to create a sufficient basis for reaching an informed decision." *Cassel*, 408 F.3d at 637 (alteration in original) (quoting *Gonzalez*, 113 F.3d at 1028). Libby contends the trial court's inquiry was inadequate because it: (1) failed to inquire why defense counsel did not move for substitution of counsel on Libby's behalf; (2) failed to provide enhanced guidance to Libby as a *pro se* litigant; and (3) failed to have an evidentiary hearing or place any participant in the inquiry under oath. Appellant's Br. at 14-19. The People argue "none of these grounds resulted in a failure by the trial court to conduct an adequate inquiry." Appellee's Br. at 16. We agree with the People.

[28]     As for Libby's first contention, the adequateness of an inquiry does not depend on whether the defendant or his counsel moves for new counsel. And we know of no relevant authority supporting Libby's suggestion that defense counsel should have or was required to move for substitution of counsel on his behalf or that failure by counsel to do so renders the

inquiry inadequate. Nevertheless, trial courts are not prohibited from hearing *pro se* motions for substitution of counsel. *See LaGrand*, 133 F.3d at 1277.

[29]    Similarly, we know of no relevant authority to support Libby's contention that the trial court had a "heightened duty" to a defendant making a *pro se* motion for new counsel that would require the trial court to explain any standard or burden that must be met in considering the motion. In suggesting that some "heightened duty" existed, Libby directs the court to *LaGrand*, which does not stand for this proposition, and *Anderson v. Angelone*, 86 F.3d 932, 935 (9th Cir. 1996). *See* Appellant's Br. at 16-17.

[30]    In *Anderson*—a civil case alleging abridgement of a prisoner's free exercise rights under the First Amendment—the Ninth Circuit held that when a trial court converts a Federal Rule of Civil Procedure 12(b)(6) motion into a summary judgment proceeding, the trial court must advise a *pro se* plaintiff of the requirements and standard for summary judgment. 86 F.3d at 934-35. Libby is a criminal defendant moving for new counsel and is not similarly situated to the plaintiff in *Anderson*. Thus, *Anderson* does not support Libby's proposition he was owed some "heightened duty" under the circumstances.

[31]    Libby's argument that the inquiry was inadequate because the trial court failed to conduct an evidentiary hearing and placed no witnesses under oath also lacks merit. We found no authority supporting the proposition that a trial court must place witnesses under oath in conducting an inquiry on a motion for new counsel, and Libby cites none. Rather, the trial court's duty following Libby's request for new counsel was not to have a full evidentiary hearing, but an inquiry, "privately and in depth," to ascertain the extent of any conflict between Libby and his counsel. *Nguyen*, 262 F.3d at 1004 (quoting *Moore*, 159 F.3d at 1160); *see also Cassel*, 408 F.3d at 637.

[32]     Libby also argues that an evidentiary hearing was required because the trial court "put his attorney in the position of contradicting [Libby]" when it received conflicting information on the number of times that Libby and defense counsel met.  Appellant's Br. at 18-19; *see also* Tr. at 4 (Pre-trial Hr'g, Sept. 11, 2019) (Libby stating he met with defense counsel four to seven times since asserting his right to a speedy trial); Tr. at 11 (Pre-trial Hr'g, Sept. 11, 2019) (defense counsel stating he met with Libby "[a] dozen, 15 times -- maybe more").  In support, Libby again cites primarily to *Wadsworth* to suggest he and his counsel were put in adversarial positions, and thus, the trial court should have tried to confirm the conflicting information.  *See* Appellant's Br. at 18-19.

[33]     The record, however, does not show that defense counsel took an adversarial or antagonistic stance against Libby; instead, it shows that Libby was questioned alone by the trial court and his counsel thereafter, and that neither was pitted against each other in open court, unlike in *Wadsworth*.  As to the discrepancy between Libby and his attorney, the trial court may, but is not required to, "explore other sources" such as available witnesses to verify any accusations made by a defendant against his attorney.  *Adelzo-Gonzalez*, 268 F.3d 778; *see also Gonzalez*, 113 F.3d at 1028.  Therefore, it was within the trial court's discretion to investigate further into any discrepancies raised during the inquiry, but its failure to do so did not render the inquiry inadequate.

[34]     Despite the discrepancy as to the number of times Libby and defense counsel met, the trial court was able to adequately probe the extent of any breakdown in the attorney-client relationship.  After Libby requested for new counsel, the trial court immediately suspended the proceedings and held a private and in-depth inquiry with him. During the inquiry, the trial court spoke at length with Libby about his relationship with defense counsel, asking him many times

to inform the court of his specific reasons for requesting new counsel. Each time Libby provided a specific reason, the court asked several specific and targeted questions about those reasons to uncover the extent of the conflict. And, when Libby raised concerns that defense counsel lacked confidence in his case and issues about his right to a speedy trial, the court asked follow-up questions and tried to ease the concerns by explaining potential reasons for an attorney's conduct. The trial court also continued the inquiry with defense counsel and asked about his interactions and relationship with Libby, along with specific questions about an issue raised by Libby about discovery. Based on our review of the record, the inquiry was adequate.

### b. Extent of conflict

[35]    The second factor we consider concerns the extent "to which the conflict between the defendant and his attorney prevented the attorney from providing effective assistance." *Cassel*, 408 F.3d at 637. In assessing this factor, we look to whether there was a "significant breakdown in communication that substantially interfered with the attorney-client relationship." *Adelzo-Gonzalez*, 268 F.3d at 779. "[A] complete lack of communication constitutes sufficient conflict to warrant the substitution of new counsel." *Nguyen*, 262 F.3d at 1005. But not "every instance of alleged disagreement between appointed counsel and an accused requires a substitution of counsel." *United States v. Williams*, 594 F.2d 1258, 1260 (9th Cir. 1979) (per curiam).

[36]    On appeal, Libby argues "[there] was more than enough for the judge to conclude [from the inquiry] that there had been a complete breakdown in communication." Appellant's Br. at 21. We disagree. Our review of the record shows there was neither a significant breakdown in communication between Libby and defense counsel nor an irreconcilable conflict.

[37]    During the inquiry, Libby raised three primary reasons for requesting new counsel: (1) defense counsel's alleged lack of interest and failure to provide Libby with discovery; (2)

defense counsel's lack of confidence in the case; and (3) defense counsel's supposed insistence that Libby waive his speedy trial rights.

[38]    As to the first reason, Libby explained to the trial court that his attorney had a "lack of interest" in his case and that his meetings and interactions with defense counsel only became more frequent after he asserted his right a speedy trial.  Tr. at 3, 7-9 (Pre-trial Hr'g, Sept. 11, 2019).  Libby informed the trial court he met with defense counsel four to seven times since asserting his right to a speedy trial, and he briefly described some of those encounters.  As to discovery, Libby first alleged that defense counsel was withholding discovery from him.  Libby then stated his defense counsel did provide him with discovery except for certain photos, but that counsel informed him he would need to wait until trial to see the photos.  The trial court later clarified with defense counsel that there was no outstanding discovery between the parties and that counsel had just received these photos.

[39]    As for the latter two reasons, Libby informed the trial court that defense counsel expressed to him that counsel has no "confidence in this case" and advised him on waiving his right to a speedy trial.  *Id.* at 7-8.  To ease Libby's concerns, the trial court offered explanations on why these reasons could have been for his benefit.  The court stated: "[T]he lawyer has an obligation to give you his best legal advice and what he sees as your best and worst case scenarios . . . ."  *Id.* at 7.  The trial court also explained to Libby that attorneys often ask their clients to waive their speedy trial rights to give the attorney more time to prepare for trial.  We raise the trial court's explanation to show that none of the reasons raised by Libby during the inquiry reflect a significant breakdown in communication; instead, they show active communication and a functional working relationship between attorney and client.

[40]     Libby also contends the record reveals an irreconcilable conflict and a breakdown in communication because of a statement by defense counsel that Libby had refused to meet with him on the day before the inquiry. Appellant's Br. at 22, 24-25. We find no merit to this argument. Though we recognize that defense counsel admitted during the inquiry that Libby refused to see him one time, the record lacks any showing that: (1) Libby himself had refused to work or communicate with counsel; or (2) a hostile and antagonistic relationship existed between the parties. Libby also did not express during the inquiry that he would not communicate with defense counsel in the future or that he had lost trust in counsel's ability to adequately defend him. For these reasons, and given the record, we believe it would be difficult for the trial court to infer that the extent of conflict presented during the inquiry showed a significant breakdown in communication or an irreconcilable conflict.

### c. Timeliness

[41]     The third factor we consider is "the timeliness of the motion and the extent of resulting inconvenience or delay." *Cassel*, 408 F.3d at 637. Generally, trial courts "do have broad latitude to deny a motion for substitution of counsel on the eve of trial when the request would require a continuance." *Nguyen*, 262 F.3d at 1003. "However, this discretion must be balanced against the defendant's Sixth Amendment right to counsel." *Id.* From our review of the record, the trial court did not expressly address the timeliness of Libby's request. The trial court did not even appear to consider the delay that would have likely resulted in granting the request given it was brought just before jury selection, and Libby asserted his right to a speedy trial. Conversely, nothing in the record suggests the trial court prioritized its schedule or was persistent in proceeding with trial at the expense of Libby's Sixth Amendment rights. This contrasts with the circumstances in *Moore*, where "[t]he court seemed above all to be determined not to disturb its

trial schedule, evidenced by the court's willingness to substitute counsel only if [the defendant] could arrange new counsel in time for trial." 159 F.3d at 1160.

[42]    Although our ability to evaluate the timeliness of Libby's request is hampered by the trial court's lack of inquiry on this issue, our review shows the request was likely untimely and would have caused delay. The request was made on the day jury selection and trial was scheduled to begin, and if granted, it would have created both inconvenience and delay considering the time it would take for a new attorney to become familiar with the case. But we recognize that, even if the motion was likely untimely, this factor alone would not justify denial of Libby's request. *See United States v. Lillie*, 989 F.2d 1054, 1056 (9th Cir. 1993), *overruled on other grounds by Garrett*, 179 F.3d at 1145; *Adelzo-Gonzalez*, 268 F.3d at 780 ("[W]hen a motion is made on the day of trial, the court must make a balancing determination, carefully weighing the resulting inconvenience and delay against the defendant's important constitutional right to counsel of his choice." (alteration in original) (quoting *D'Amore*, 56 F.3d at 1206)).

[43]    Because our review of the factors in their totality weigh in favor of the trial court's decision to deny Libby's request for new counsel, the trial court did not abuse its discretion.

**B.  Alleged Improper Trial Court Participation**

[44]    The second issue Libby raises concerns statements made by the trial court that Libby alleges were error and deprived him of a fair trial. Appellant's Br. at 26. Specifically, Libby contends he was deprived of a fair trial because of the trial court's "interference with cross-examination" and remark that Libby's counsel gave the jury a "false impression" about an officer's ability to record an arrest with their personal phone. *Id.* In response, the People argue the trial court's questioning of Officer Calvo and its subsequent remarks "were proper and did not amount to actual bias nor did it project an appearance of advocacy or partiality." Appellee's

Br. at 32. We agree in part with the People's argument but disagree as to their contention that the trial court's remarks were proper. The trial court's remarks were inappropriate, but they did not amount to plain error.[3] Because the trial court's participation during Officer Calvo's cross-examination involved questions and various remarks, we examine separately the trial court's authority to question a witness, the question, and the remarks made thereafter.

### 1. The trial court's questioning of Officer Calvo was proper

[45] As the People contend, trial courts and judges have discretion "to call and examine witnesses in the interests of justice and the ascertainment of truth." *Smith v. United States*, 321 F.2d 427, 431 (9th Cir. 1963); *see also* Guam R. Evid. 611. This is because "'[a] trial judge is more than a moderator or umpire.' His responsibility is to preside in the manner and with the demeanor to provide a fair trial to all parties and his discretion in the performance of this duty and management is wide." *United States v. Larson*, 507 F.2d 385, 389 (9th Cir. 1974) (per curiam) (citing *Robinson v. United States*, 401 F.2d 248, 252 (9th Cir. 1968)). A trial court may therefore "participate in the examination of witnesses for the purpose of clarifying the evidence, confining counsel to evidentiary rulings, controlling the orderly presentation of the evidence, and preventing undue repetition of testimony." *United States v. Mostella*, 802 F.2d 358, 361 (9th Cir. 1986) (citing *United States v. Allsup*, 566 F.2d 68, 72 (9th Cir. 1977); *United States v. Malcolm*, 475 F.2d 420, 427 (9th Cir. 1973)). But, when questioning a witness, "[t]he [trial] court may not . . . assume the role of either the prosecution or of the defense. The court's questioning must be 'temperate, nonargumentative, and scrupulously fair,' and it must not convey to the jury the court's opinion of the witness's credibility." *People v. Cook*, 139 P.3d

---

[3] As Libby did not object to the trial court's question or remarks, we review for plain error. However, we are mindful that, in some cases, the types of the errors complained of here may require additional review for structural error or defect. *See People v. Callahan*, 2018 Guam 17 ¶ 32 (citing *Neder v. United States*, 527 U.S. 1, 8 (1999)).

492, 516 (Cal. 2006) (internal citations omitted). Most important, the trial court "must be ever mindful of the sensitive role it plays in a jury trial and avoid even the appearance of advocacy or partiality." *United States v. Harris*, 501 F.2d 1, 10 (9th Cir. 1974).

[46]     A trial court's questioning of a witness is also permitted by Rule 614 of the Guam Rules of Evidence ("GRE"), which states:

> (a) Calling by court. The court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called.
>
> (b) Interrogation by court. The court may interrogate witnesses, whether called by itself or by a party.
>
> (c) Objections. Objections to the calling of witnesses by the court or to interrogation by it may be made at the time or at the next available opportunity when the jury is present.

Guam R. Evid. 614.

[47]     Here, the trial court questioned Officer Calvo during cross-examination by defense counsel and asked: "What happens when you record an arrest through your phone?" Tr. at 43 (Jury Trial, Sept. 11, 2019). Our careful review of the record shows the question posed by the trial court was asked after cross-examination by defense counsel suggesting the alleged unwillingness of officers to record an arrest using a body camera or their personal phone. During the cross-examination, several objections were made by the People, some of which were sustained, for argumentative or speculative questions asked by defense counsel. Officer Calvo also testified, before the trial court's participation, that the officers involved in Libby's arrest were not equipped to make a recording of their actions, that he has not seen an officer record an arrest with their own personal phone, and that an officer had to personally buy their own body camera, but that wearing one was neither discouraged nor encouraged. Because of the previous testimony on record, it is apparent the trial court, in questioning Officer Calvo, was trying to

develop facts to clarify testimony that alluded to why officers did not record Libby's arrest. Against this backdrop, the trial court's questioning of Officer Calvo was proper under GRE 614(b).

### 2. The trial court's remarks after questioning Officer Calvo were inappropriate, but any error was not clear and obvious

[48]   The trial court made several inappropriate remarks after it questioned Officer Calvo. In response to the trial court's question about what happens when an officer records an arrest with their personal phone, Officer Calvo stated: "[The phone] would be confiscated as evidence." Tr. at 43 (Jury Trial, Sept. 11, 2019). After Officer Calvo's answer, the trial court remarked: "The phone gets taken by Guam Police Department, which probably explains why the officers don't record an arrest." *Id.* The trial court further stated: "I just don't want to leave the jury with a false impression that the officers don't want to record. . . . It's just not practical . . . ." *Id.* After defense counsel stated that he, too, did not want anybody making false impressions, the trial court commented:

> THE COURT: And the other thing is -- I'm sorry, counsel, I didn't mean to say "false impression," but an impression that these officers didn't want to record, if they're allowed to record, they would.
>
> The fact that there is a general order suggests that it's not willy-nilly that there is a policy and a procedure by which it's done. You don't just take out your phone and start recording, you follow department procedures. And if he deviated from that procedure, he would be taken to task for that.
>
> . . . .
>
> THE COURT: My job, ladies and gentlemen, is to make sure that you get balanced presentation of the evidence when it's necessary. I rarely step in, but I think that that's an important thing to do today.

*Id.* at 44-45.

[49]     Libby argues these remarks were improper and alleges the trial court said that defense counsel was trying to give the jury a "false impression" about an officer's ability to record an arrest with their personal phone.  Appellant's Br. at 26-29.  Libby also characterizes some of the trial court's remarks as "opinion testimony" or testimonial in nature, *see id.* at 29, and in his reply brief, argues the remarks projected bias, advocacy, or partiality, *see* Appellant's Reply Br. at 19 (May 10, 2021).  In response, the People argue the remarks were proper and were made under the trial court's authority "to clarify evidence and control its orderly presentation." Appellee's Br. at 36-40.

[50]     We disagree with the People's and Libby's characterizations of the remarks.  These specific remarks were inappropriate and did not fall within the scope of judicial questioning permitted under GRE 614.  The remarks were made after Officer Calvo had answered the trial court's question about what happens when an officer records an arrest on their personal phone. We recognize that, in making these remarks, the trial court was trying to clarify and explain to the jury the potential reasons an officer does not record an arrest with their personal phone, given defense counsel's argumentative and speculative cross-examination on the issue.  Even so, such unprompted remarks suggested the trial court's own commentary as to the issue, which, under more serious circumstances, could distort the jury's fact-finding role.

[51]     Though these remarks were inappropriate, we recognize not every judicial utterance, other than a question posed to a witness, is inappropriate.  "[A] [trial] judge is not relegated to complete silence and inaction during the course of a criminal jury trial.  He must, however, be most careful that his interventions are proper, timely, made in a fair effort to clear unanswered issues, and are not prejudicial to [the] defendant."  *Bursten v. United States*, 395 F.2d 976, 982-83 (5th Cir. 1968); *see also Moody v. United States*, 377 F.2d 175, 178 (5th Cir. 1967) (listing

cases recognizing power of trial court to comment on evidence and express opinions within limits). Nevertheless:

> A trial judge's participation oversteps the bounds of propriety and deprives the parties of a fair trial only when "the record discloses actual bias . . . or leaves the reviewing court with an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality."

*United States v. Parker*, 241 F.3d 1114, 1119 (9th Cir. 2001) (omission in original) (quoting *Mostella*, 802 F.2d at 361); *see also Malcolm*, 475 F.2d at 427 ("The trial court's role is especially sensitive in a jury trial. It must be ever mindful to eschew advocacy or the appearance of advocacy.").

[52]     The People argue the trial court's remarks did not "project bias, advocacy, or partiality" and that the "trial court's participation was neutral and not extensive." Appellee's Br. 36, 42. Though the remarks were inappropriate and approached but did not cross the line in projecting to the jury an appearance of advocacy or partiality, we agree with the People. Contrary to Libby's contention that the remarks projected bias, advocacy, or partiality, our careful scrutiny of the record shows the remarks were neutral and had a nonprejudicial effect considering the context in which they were made. Before the trial court's remarks, the jury had received testimony from Officer Calvo that the officers involved in Libby's arrest were not equipped to make a recording of the arrest and that Officer Calvo had not observed an officer record an arrest with their personal phone. When the trial court asked Officer Calvo about what happens when an officer records an arrest with their phone, the officer stated: "[The phone] would be confiscated as evidence." Tr. at 43 (Jury Trial, Sept. 11, 2019). Officer Calvo also testified about a general order on body cameras and stated that an officer had to personally buy their own body camera, but that wearing one was neither discouraged nor encouraged. With context, the trial court's

remarks seemed designed to clarify the evidence following various objectionable questions asked by Libby's counsel on cross-examination. Considering Officer Calvo's testimony and the record, we do not believe the trial court's remarks show actual bias or project the appearance of advocacy or partiality.

[53]    Libby further argues the trial court claimed that defense counsel was trying to give the jury a "false impression" about an officer's ability to record an arrest with their personal phone. Appellant's Br. at 26. He alleges that, in making this statement, the trial court was criticizing defense counsel and vouching for the People's witness. *Id.* at 31. We do not perceive it in that way, and the record shows the remark was not specifically directed at defense counsel. The record also shows the trial court clarified itself and stated: "I'm sorry, counsel, I didn't mean to say, 'false impression,' but an impression that these officers didn't want to record, if they're allowed to record, they would." Tr. at 44 (Jury Trial, Sept. 11, 2019). Taken in context, this specific remark does not show bias, advocacy, or partiality.

[54]    While the trial court's remarks were inappropriate, any error was not clear or obvious under current law because the remarks did not show actual bias or project the appearance of advocacy or partiality.

### 3. Even if the remarks were clear error, the error did not affect Libby's substantial rights

[55]    Even assuming the trial court's remarks constituted clear or obvious error, Libby fails the third prong of plain error review. To show that an error affected a defendant's substantial rights, "the burden lies with the defendant to demonstrate that the error was prejudicial (i.e., that it affected the outcome of the case)." *People v. Ramey*, 2019 Guam 11 ¶ 23 (quoting *People v. Mendiola*, 2010 Guam 5 ¶ 24). On appeal, Libby failed to demonstrate any specific prejudice that occurred as a result of the trial court's remarks. This is likely because Libby framed his

appeal on this issue as reflecting structural error. Had we determined the trial court's remarks showed actual bias or projected the appearance of advocacy or partiality, we recognize our plain error analysis would likely shift to a review for structural error or defect. *See People v. Callahan*, 2018 Guam 17 ¶ 32 (citing *Neder v. United States*, 527 U.S. 1, 7-8 (1999)). We need not reach that juncture in this appeal because the record does not disclose actual bias nor did the trial court's remarks project to the jury an appearance of advocacy or partiality.

[56]    Our review of the record uncovers no significant prejudice that resulted from the trial court's remarks. The trial court also instructed the jury that statements made by the court or questions it posed to witnesses were not evidence and that the jury should disregard any statements it made in determining the facts. These curative instructions obviated any possible adverse impact from the trial court's remarks. *See United States v. Sanchez-Lopez*, 879 F.2d 541, 553 (9th Cir. 1989); *Parker*, 241 F.3d at 1119.

[57]    Finally, the record shows overwhelming evidence of guilt, which Libby does not dispute on appeal. This evidence consisted of physical and video surveillance, *see* Tr. at 27-31, 32-36 (Jury Trial, Sept. 12, 2019); Tr. at 68-73 (Jury Trial, Sept. 11, 2019), victim testimony, *see* Tr. at 6-26 (Jury Trial, Sept. 12, 2019), and positive identification by law enforcement, *see* Tr. at 28-30, 65-67 (Jury Trial, Sept. 11, 2019). Without prejudice, the error could not have affected Libby's substantial rights; thus, reversal for plain error is inappropriate.

//

//

//

//

//

## V.  CONCLUSION

**[58]**    We **AFFIRM** the judgment of conviction.


| /s/ | /s/ |
| --- | --- |
| ROBERT J. TORRES | KATHERINE A. MARAMAN |
| Associate Justice | Associate Justice |


/s/
F. PHILIP CARBULLIDO
Chief Justice