

**Filed**
Supreme Court of Guam, Clerk of Court

# IN THE SUPREME COURT OF GUAM

## PEOPLE OF GUAM,
Plaintiff-Appellee,

**v.**

## LOUIS ANTHONY VARGAS,
Defendant-Appellant.

Supreme Court Case No.: CRA21-015
Superior Court Case No.: CF0446-18

## AMENDED OPINION ON REHEARING

## Cite as: 2024 Guam 1

Appeal from the Superior Court of Guam
Argued and submitted on June 14, 2023
Rehearing Petition submitted on December 21, 2023
Hagåtña, Guam

Appearing for Defendant-Appellant:
Braddock J. Huesman, *Esq.*
Fisher Huesman P.C.
Core Pacific Bldg.
545 Chalan San Antonio, Ste. 302
Tamuning, GU 96913

Appearing for Plaintiff-Appellee:
Marianne Woloschuk, *Esq.*
Assistant Attorney General
Office of the Attorney General
Prosecution Division
590 S. Marine Corps Dr., Ste. 901
Tamuning, GU 96913



**E-Received**
5/21/2024 5:00:54 PM

BEFORE: ROBERT J. TORRES, Chief Justice; F. PHILIP CARBULLIDO, Associate Justice; and KATHERINE A. MARAMAN, Associate Justice.

**CARBULLIDO, J.:**

[1]     This Amended Opinion supersedes in its entirety the prior opinion of this court in *People v. Vargas*, 2023 Guam 16. Defendant-Appellant Louis Anthony Vargas appeals his conviction for Second Degree Criminal Sexual Conduct with a Vulnerable Victim Enhancement. He argues, among other things, that in granting him access to a DNA expert only days before trial, the trial court denied him his right to a fair trial. He asks this court to vacate his conviction, grant him a new trial, and remand the case for further proceedings.

[2]     We find that the trial court recognized Vargas's right to a DNA expert but did not provide him with enough time to use the expert for the evaluation of the case and preparation for trial. The trial court thereby denied Vargas a meaningful opportunity to present a complete defense, violating his Sixth Amendment rights. We vacate the judgment of conviction on these grounds, remand for a new trial, and decline to reach the other allegations of error.

## I. FACTUAL AND PROCEDURAL BACKGROUND

[3]     On July 26, 2018, the Guam Police Department responded to a complaint reporting criminal sexual conduct. Officers arrived on the scene around 11:00 p.m., where they found L.L. (a minor), Vargas, L.L.'s mother, and, later, L.L.'s grandmother.

[4]     L.L.'s mother testified she and her daughter had been living with Vargas. L.L. was eight years old. L.L.'s mother was pregnant and engaged to marry Vargas. According to L.L.'s mother, Vargas had volunteered to put L.L. to bed that evening. L.L.'s mother had lain down herself but had become suspicious when she could not hear L.L., as she ordinarily did. She went to check on L.L. and found L.L.'s bedroom door locked. She became upset and yelled for Vargas to open the

door. At this point, she said she could make out Vargas's shadow through the door's frosted privacy glass pulling his pants up. She testified Vargas had an erection when he opened the door, and that L.L. told her he had touched her "breasts and down there." Transcript ("Tr.") at 82 (Jury Trial, May 4, 2021). She instructed L.L. to lock the door and to call 911 and her grandmother. She then went to confront Vargas, where she found him washing his hands.

[5] L.L. later testified that she had been asleep and woke up to Vargas's presence. She recounted that Vargas got on top of her and penetrated her vagina with his penis. She said that he stopped when L.L.'s mother banged on the door, and then he wiped his penis with a towel before opening the door.

[6] After conducting interviews, the police arrested Vargas. L.L.'s grandmother transported L.L. and her mother to the police precinct in Hagåtña. Certain articles were seized as evidence, including both the towel purportedly used by Vargas to wipe himself and the shorts he was wearing. An officer again interviewed L.L. at the precinct, where she was referred to Healing Hearts Crisis Center for further investigation and treatment.

[7] At Healing Hearts, a sexual assault nurse examiner conducted a health history questionnaire, during which L.L. again alleged that Vargas had abused her sexually. The nurse examiner completed a sexual assault medical form with L.L. L.L. told the nurse examiner that on that night, Vargas had kissed her and touched her breasts and vagina and that he had made penile penetration of her vagina.

[8] The nurse examiner visually examined L.L.'s vagina and took swabs from the exterior of her vagina and cervix. She also took a buccal swab to gather L.L.'s DNA. She made slides of all three swabs. The swabs were ultimately sent to the U.S. Army Criminal Investigation Laboratory

("USACIL"), where a Y-STR analysis was conducted by forensic biologist Rachel Keener.[1]  The towel and shorts were sent to DNA analyst Dr. Penny Kremer at the Honolulu Police Department Scientific Investigation Section for analysis.

[9]      At Healing Hearts, a social worker also interviewed L.L.  L.L. told the social worker that Vargas had been engaging in this conduct for over a year and gave specific details about three occasions.

[10]      Vargas was indicted on multiple charges of criminal sexual conduct, each including a vulnerable victim enhancement.[2]  On December 26, 2018, during discovery, Vargas was provided with Rachel Keener's USACIL DNA report.  *See* People's Mot. Suppl. R. at Ex. 1 (May 3, 2023) (moving this court to introduce acknowledgment receipts showing when Vargas received discovery concerning DNA reports; granted, CRA21-015 (Order, June 2, 2023)).  On June 3, 2019, Vargas made his first motion to appoint a DNA expert.[3]  He requested an expert knowledgeable in Y-STR testing.  The judge who was initially assigned to the case found that, although Vargas was an indigent defendant, he could access the People's expert for interview to become educated on the testing process and would have the opportunity for cross-examination.  Thus, the court denied Vargas's motion, ruling he had not made a particularized showing of his need for his own expert witness.

----

[1] The Y-STR test analyzes the short tandem repeat markers located on the Y chromosome.  According to Keener, this type of DNA testing focuses only on the Y chromosome and allows detection where a small amount of male DNA may be mixed with a large amount of female DNA.

[2] Vargas was initially charged with eight counts of First Degree Criminal Sexual Conduct (as a First Degree Felony) and six counts of Second Degree Criminal Sexual Conduct (as a First Degree Felony) with vulnerable victim enhancements for each count charged.  After defense counsel rested on its case-in-chief, the People dropped several charges, and Vargas ultimately faced five counts of First Degree Criminal Sexual Conduct (as a First Degree Felony) and five counts of Second Degree Criminal Sexual Conduct (as a First Degree Felony).  The vulnerable victim enhancements remained for each of the remaining counts charged.

[3] Vargas's request for a forensic psychologist was also denied by the trial court.  As Vargas does not raise this denial on appeal, we do not address it.

**[11]** On February 26, 2020, the People provided Vargas with the Honolulu Police Department DNA analysis report. A year later, on February 24, 2021, a new judge assumed Vargas's case. The trial was scheduled for Monday, April 26, 2021.

**[12]** On April 14, 2021, Vargas asked the trial court to reconsider its decision to deny him an expert. This request was similar to the first, noting the necessity of an expert for explaining Y-STR evidence, but also requesting a DNA examiner trained in transfer DNA principles. The new trial judge granted the motion on April 23—the Friday before trial. The judge acknowledged the difficulty of Vargas's situation but simultaneously informed Vargas that he would not tolerate delay: "[G]ood luck in getting an expert on this . . . because it's going to [be] like the eve of trial. . . . Because of the pressures all the judges have on limited courtrooms, I'm not going to give you enough time to, you know, look, because we do have a lot of asserted speedy trials." Tr. at 7 (Mot. Hr'g, Apr. 23, 2021).

**[13]** On the second and third days of trial, the People's DNA experts took the stand. Keener testified that she conducted her analysis to investigate whether any male DNA was present on L.L.'s cervix. Her analysis revealed male DNA on the vaginal and cervical swabs. Keener did not find semen on the swabs, though she did find male DNA, potentially from saliva or skin cells. The DNA she tested allowed her to develop a partial profile. She could not exclude Vargas from the sample, meaning he was a possible contributor. She calculated statistically the probability that a randomly selected, unrelated male would have DNA that would allow the same finding. Concerning the vaginal swab, the chance that a random male would have fit the profile found is "1 in 101 Caucasians, 1 in 179 black and 1 in 250 Hispanic individuals." Tr. at 95 (Jury Trial, Apr. 28, 2021). For the cervical swab, the chance that a random male would fit the profile found is "1 in 86 Caucasians, 1 in 158 black, and 1 in 209 Hispanics." *Id.* at 97-98.

[14]     Dr. Kremer of the Honolulu Police Department later tested the towel and the shorts. Based on a visual analysis, she took three samples from each item. At two places on the towel, she could identify epithelial and sperm cells and concluded that the probability of finding a random person unrelated to Vargas that matched the DNA profile would be greater than one in eight trillion. A second person's DNA was detected on the towel at those locations, but only in low amounts, so Dr. Kremer could not make any conclusions about L.L. At the third site on the towel, there was a mixture of three or more individuals' DNA, not including sperm cells. At that site, L.L. could not be excluded as a contributor of the DNA, but no conclusion could be drawn as to Vargas.

[15]     Concerning the shorts, one test site did not contain enough DNA to create an interpretable profile, and another did not have DNA. A swab taken from the interior of the shorts, from the waist area to the crotch area, included a mixture of DNA from two individuals, including sperm cells. Dr. Kremer concluded that, concerning the sperm cell fraction of the DNA, "the profile [she] obtained matched the profile of Louis Vargas." *Id.* at 192, 195. She also concluded that L.L. could not be excluded as a contributor, and that there was a greater than one in eight trillion chance she could not exclude a randomly selected, unrelated individual. In other words, it was overwhelmingly likely that the DNA came from L.L.

[16]     Defense counsel was able to cross-examine both expert witnesses, but even the People concede that "[t]he record is unclear whether defense counsel had the assistance of [an expert] to prepare for and conduct a thorough cross-examination of the People's DNA experts . . . ." Appellee's Br. at 34 (Apr. 25, 2023). Questioning was somewhat general and exploratory, centering on the testing process, the relatively small amount of male DNA found on the swabs tested at USACIL, a reiteration of the results, and the effect on the statistical probabilities if the labs considered a related individual as a possible contributor of DNA.

**[17]**     Although the record is unclear on when the defense retained a DNA expert, Dr. Philip Danielson was certified as an expert in molecular biology, serology, and DNA analysis on May 4—the sixth day of trial.  The People's attorneys insisted on being able to consult their own experts before cross-examining Dr. Danielson, since they would not know what sorts of questions to ask of him themselves.  This request was granted.

**[18]**     The trial proceeded for six more days.  The jury ultimately returned a guilty verdict for Second Degree Criminal Sexual Conduct (as a First Degree Felony) for the events that took place on the night the police were called.  They also found Vargas guilty of the attached vulnerable victim enhancement.[4]  He was sentenced to twenty years in prison for Second Degree Criminal Sexual Conduct, all but ten of which were suspended, and twenty additional years for the vulnerable victim enhancement, all but five of which were suspended.  Vargas timely appealed.

## II.  JURISDICTION

**[19]**     This court has jurisdiction over appeals from final judgments and orders of the Superior Court.  48 U.S.C.A. § 1424-1(a)(2) (Westlaw through Pub. L. 118-22 (2023)); 7 GCA §§ 3107(b), 3108(a) (2005); 8 GCA §§ 130.10, 130.15(a) (2005).

## III.  STANDARD OF REVIEW

**[20]**     "The Sixth Amendment is incorporated and made applicable to Guam through the Organic Act."  *People v. Titus*, 2020 Guam 16 ¶ 19 (per curiam) (citing 48 U.S.C.A. § 1421b(g), (u)).  In criminal prosecutions, the accused is guaranteed the assistance of counsel for his defense.  U.S. Const. amend. VI.  We have previously stated that "[e]ffective assistance of counsel includes the

---

[4] The jury could not come to an agreement concerning the remaining charges.  Based on a misunderstanding, they presented the trial court with unmarked forms for those charges along with the guilty verdict on Charge Two, Count Four.  Thus, the trial court did not believe an *Allen* Charge, encouraging jurors to come to a definitive resolution, would be appropriate and declared a hung jury as to the remaining charges.  Because of the victim's inability to retestify because of emotional distress, the lack of a statute of limitations on the charges against Vargas, and a finding of a manifest necessity to accept the hung verdicts, the trial court decided to dismiss the remaining charges without prejudice.

right to access expert witnesses." *People v. Quitugua*, 2021 Guam 20 ¶ 16. "We review the denial

of a 'request for public funds to hire an expert' for an abuse of discretion." *People v. Santos*, 2003

Guam 1 ¶ 15 (quoting *United States v. Labansat*, 94 F.3d 527, 530 (9th Cir. 1996)). "The defendant

'must show that the lack of an expert deprived him of effective assistance of counsel . . . [by]

demonstrat[ing] *both* that reasonably competent counsel would have required the assistance of the

requested expert for a paying client, *and* that he was prejudiced by the lack of expert assistance.'"

*Id.* (alterations in original) (quoting *Labansat*, 94 F.3d at 530). "Prejudice must be shown by clear

and convincing evidence." *Id.* (quoting *Labansat*, 94 F.3d at 530). "Appointment is required and

prejudice is established when a defendant shows: (1) that he or she is financially unable to pay the

fees of the witness; and (2) that the presence of the witness is necessary to an adequate defense."

*People v. Callahan*, 2018 Guam 17 ¶ 36 (citing 8 GCA § 75.15 (2005)).

[21]    If a trial court abuses its discretion by denying appointment of an expert, "we are required

to reverse the conviction unless the prosecution demonstrates that the error is harmless." *See*

*People v. Pugh*, 2018 Guam 14 ¶ 26. "A constitutional error is harmless when 'it appears beyond

a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *People*

*v. San Nicolas*, 2020 Guam 9 ¶ 6 (quoting *People v. Torres*, 2014 Guam 8 ¶ 34). Because "the

burden is on the People to demonstrate harmlessness," their failure to address it "results in a failure

to meet this burden." *Pugh*, 2018 Guam 14 ¶¶ 27, 29.

## IV.  ANALYSIS

### A.  The Trial Court Abused its Discretion in Recognizing Vargas's Right to a DNA Expert but Forcing Him to Go to Trial Without the Opportunity to Use the Expert to Evaluate and Prepare for His Defense

[22]    Vargas asserts he was denied a fair trial because he received approval for access to his own

defense expert only three days before the trial began, while the prosecution presented their experts

on the second and third day of trial. Appellant's Br. at 13-14 (Dec. 12, 2022). He argues it was impossible for the trial court to cure his inability to properly prepare for trial by allowing him an expert just days before trial began, and that an expert is necessary for "evaluation, preparation, and presentation of the defense." *Id.* at 14-15, 17 (quoting *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985)).

[23]    Vargas, an indigent defendant, could not pay the fees of an expert witness. The question then is whether Vargas was unfairly denied appointment of an expert witness necessary to his defense.[5]

[24]    In *Ake v. Oklahoma*, the U.S. Supreme Court explained the need for an expert extends beyond mere presence at trial, but also to the "evaluation, preparation, and presentation of the defense." 470 U.S. at 83. Although the holding in *Ake* concerned a psychiatrist, this court has noted its extension to "the appointment of other types of expert witnesses." *Santos*, 2003 Guam 1 ¶ 19. The principle expressed in *Ake* applies here. *See* 8 GCA § 75.15 (codifying the right to a witness "necessary to an adequate defense").

[25]    Between the denial of Vargas's first motion for a DNA expert and his motion for reconsideration, nearly two and a half years passed.[6] Though he eventually received access to an expert, the evaluation and preparation of his defense for trial were nearly complete. Thus, Vargas's

---

[5] The original trial judge denied Vargas's motion for a DNA expert because Vargas failed to make "any particularized showing of why he needs his own expert to testify on his behalf." Record on Appeal ("RA"), tab 112 at 4 (Dec. & Order Mot. Appt. DNA Expert, Nov. 4, 2019). Though Vargas initially seemed to argue that this decision denied him a fair trial by forcing him to prepare for trial without an expert, *see* Appellant's Br. at 13 (Dec. 12, 2022), he later stated that denying his first motion for an expert was irrelevant. Appellant's Reply Br. at 2 (May 8, 2023). Consequently, our review is limited to the circumstances of Vargas's motion for reconsideration just before trial.

[6] The People argue that Vargas "spent a great deal of time sitting on his hands instead of taking action." Appellee's Br. at 34 (Apr. 25, 2023). The suggestion is that this appeal should fail because he is to blame for the limited time with which he was able to utilize an expert. We note that Vargas was not required to move for reconsideration. *See Enriquez v. Smith*, 2012 Guam 15 ¶ 17 n.6. In the absence of such a request, we could have reached the initial denial on appeal despite the passage of time between the decision and trial. *See, e.g.*, *State v. Adam*, 40 P.3d 877, 884 (Haw. 2002) ("As a general rule, an appeal from a final judgment in a case brings up for review all preceding interlocutory orders in the case."). Furthermore, although his second request was not made immediately upon a new judge taking over the case, nothing in the record before us suggests that there was an intentional strategy to sandbag proceedings. We will not assign error to Vargas for simply reasserting his rights.

presentation of his defense was hindered because there was insufficient time to use the expert for the evaluation of the case and preparation for trial, including preparing defense counsel to cross-examine the prosecution's experts or make any evidentiary challenge to the scientific evidence. *See, e.g.*, *Singer v. State*, 286 So. 3d 343, 345 (Fla. Dist. Ct. App. 2019) ("As to the time for preparation, the experience of counsel, and complexity of the case, defense counsel had only twelve days to analyze the FDLE report. Based on counsel's limited experience with DNA cases and lack of familiarity with FDLE's current procedures, combined with the complexity of the expert report at issue here, we conclude that twelve days was wholly inadequate to prepare for trial."); *State v. Schramm*, 933 N.W.2d 600, 611 (Neb. Ct. App. 2019) (holding "it would be very difficult, if not impossible, to secure such a medical opinion" in a 10-day timeframe); *Moody v. State*, 436 S.E.2d 545, 547 (Ga. Ct. App. 1993) (finding seven days before trial was not adequate opportunity to prepare defense to DNA report and cross-examination of expert witness).

[26]     DNA evidence is technical and highly complex. The People were unwilling to cross-examine Vargas's expert witness without consulting their own, implicitly recognizing expert assistance was necessary. Though the defense attorneys may have been exposed to DNA expert reports or testimony during their careers, it is hard to imagine a layperson—or even a lawyer—having enough grasp of the topic to contend with an expert in the field, particularly in real time in front of a jury. Access to the People's witnesses seems unlikely to allow for this level of understanding. One finds it difficult to imagine an expert willingly volunteering information that would allow defense counsel to discredit them. Although defense counsel tried to cast doubt on expert conclusions during cross-examination, counsel was simply not given sufficient time to prepare and present an adequate defense. *See Commonwealth v. Ross*, 57 A.3d 85, 98 (Pa. Super. Ct. 2012) ("While our review of the record likewise reflects that [counsel] did the best job that he

could in representing [defendant] under the circumstances presented, he undoubtedly could have done a more effective job if he had been permitted adequate time to prepare a defense. Instead, as a result of the trial court's unreasonable insistence on rushing the case to trial, [counsel] was put in the untenable position of having to prepare his case at the same time that he was trying it."). Indeed, we can see from the record that defense counsel was more effective through the eventual use of the defense's own expert, given the additional time to prepare. Reasonably competent counsel would have required its own expert at an earlier stage to present a complete defense.[7]

[27]     As Vargas points out, DNA evidence played a vital role in his conviction. *See* Appellant's Br. at 20. We find there is clear and convincing evidence that the denial of an expert to aid in preparation prejudiced his case. *See Callahan*, 2018 Guam 17 ¶¶ 38-43. Though the trial court eventually granted him a DNA expert, it was too late for Vargas to present an adequate defense. This amounts to a constructive denial of Vargas's request.

[28]     The error would have been cured if the trial court had granted a continuance *sua sponte*.[8] Instead, it telegraphed to the defense that it was unwilling to delay proceedings: "[G]ood luck in getting an expert on this . . . because it's going to [be] like the eve of trial. . . . Because of the

---

[7] As one professor explains:

> Well-prepared, aggressive defense lawyers win cases even though the prosecution has DNA evidence in their favor. They win dismissals by successfully challenging the admissibility of the DNA evidence under *Frye* or *Daubert*. They win better plea offers for their clients by aggressively challenging the quality of the forensic analyst's work pre-trial and they win trials--complete and full acquittals in cases in which the prosecution presents forensic DNA evidence through an expert.

Albert E. Scherr, *Ineffective Assistance of Counsel in DNA Cases: A Re-Appraisal of the Effectiveness of Strickland v. Washington Judges*, 55 Loy. L.A. L. Rev. 527, 591 (2022).

[8] "[A] prosecuting attorney in a criminal case represents the people and [has a] duty to be impartial . . . . [The] obligation is not simply to obtain a conviction but to see that justice is done and that the accused gets a fair trial." *State v. Whitman*, 788 S.W.2d 328, 335 (Mo. Ct. App. 1990) (internal citations omitted); *see also People v. Mendiola*, 2010 Guam 5 ¶ 36 ("The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935))). This error also could have been avoided if the prosecution met its independent obligations to do justice and see that the accused receives a fair trial by supporting a continuance.

pressures all the judges have on limited courtrooms, I'm not going to give you enough time to, you know, look, because we do have a lot of asserted speedy trials." Tr. at 7 (Mot. Hr'g). Other courts have held that where it is clear from the circumstances that it would be futile to do so, there is no need to preserve an objection on the record. *See People ex rel. Klaeren v. Village of Lisle*, 781 N.E.2d 223, 231 (Ill. 2002); *Staubes v. City of Folly Beach*, 529 S.E.2d 543, 547 (S.C. 2000); *Roundy v. Staley*, 1999 UT App 229, ¶ 6, 984 P.2d 404. We find here that a motion from Vargas for continuance would have been futile, and so its absence does not inhibit our review.

[29]     Vargas was granted the funds to retain an expert the Friday before jury selection began on Monday. That an expert was eventually found does not cure the error. The defense was forced to evaluate the evidence against Vargas and create a trial strategy without the assistance of an expert of its own. It is no justification for the error that Vargas's counsel resolutely took on the task, nor that the expert Vargas eventually found refuted specific points against him. The fact remains that Vargas was forced to complete evaluation and preparation without the expert's assistance. The trial court abused its discretion.

**B. The Prosecution Failed to Show that the Trial Court's Error Was Harmless Beyond a Reasonable Doubt**

[30]     When a trial court abuses its discretion, "we are required to reverse the conviction unless the prosecution demonstrates that the error is harmless." *See Pugh*, 2018 Guam 14 ¶ 26. Because the error constructively denied Vargas effective assistance of counsel, it is constitutional in nature. We can find a constitutional error harmless only if "this court is convinced beyond a reasonable doubt that the error did *not* contribute to the verdict obtained." *Callahan*, 2018 Guam 17 ¶ 26 n.2. We have previously held that when the People completely fail to address harmless error, they fail to meet their burden to prove harmlessness, and reversal is required. *Pugh*, 2018 Guam 14 ¶ 29. The People failed to discuss the error's harmlessness, so the argument is forfeited. *See id.* ¶ 29.

Even had they done so, it is unlikely we would find that the error did not affect the verdict. DNA evidence weighed heavily in this case, and Vargas was forced to evaluate and contend with it, without expert assistance, for the entire pretrial period.

**C. We Need Not Reach the Other Issues Raised by Vargas**

[31]    Vargas also raised questions regarding the Confrontation Clause and prosecutorial misconduct. Appellant's Br. at 4-5. Because we are reversing his conviction on other grounds, we need not and do not reach the merits of these questions.

## V. CONCLUSION

[32]    Vargas had a right to a DNA expert, which was necessary to evaluate, prepare, and present a complete defense. Though he was eventually appointed one, it was just a couple of days before the trial, and the trial court telegraphed that it would not entertain a motion for continuance. This violated Vargas's Sixth Amendment right to effective assistance of counsel and was therefore an abuse of the trial court's discretion. We cannot find this error was harmless beyond a reasonable doubt. Because this error is dispositive, we need not reach the other questions Vargas raises on appeal. We **VACATE** Vargas's conviction and **REMAND** this matter for a new trial.

|  |  |
|---|---|
| /s/ | /s/ |
| F. PHILIP CARBULLIDO | KATHERINE A. MARAMAN |
| Associate Justice | Associate Justice |

/s/
ROBERT J. TORRES
Chief Justice