
# IN THE SUPREME COURT OF GUAM

**PEOPLE OF GUAM,**
Plaintiff-Appellee,

**v.**

**ROBBY NARRUHN,**
**aka Robby R. Narruhn, aka Robby Rouk Narruhn,**
Defendant-Appellant.

Supreme Court Case No. CRA24-002
Superior Court Case No. CF0101-22

## OPINION

## Cite as: 2025 Guam 11

Appeal from the Superior Court of Guam
Argued and submitted on October 16, 2024
Hagåtña, Guam

Appearing for Defendant-Appellant:
Peter C. Perez, *Esq.*
Law Office of Peter C. Perez
DNA Bldg.
238 Archbishop Flores St., Ste. 802
Hagåtña, GU 96910

Appearing for Plaintiff-Appellee:
Christine Santos Tenorio, *Esq.*
Assistant Attorney General
Office of the Attorney General
General Crimes Division
134 W. Soledad Ave., Ste. 301
Hagåtña, GU 96910


E-Received
12/16/2025 4:21:27 PM

BEFORE: ROBERT J. TORRES, Chief Justice; F. PHILIP CARBULLIDO, Associate Justice; and KATHERINE A. MARAMAN, Associate Justice.

**MARAMAN, J.:**

[1]     This is an appeal from a jury verdict convicting Defendant-Appellant Robby Narruhn of one charge of Burglary and one charge of Third Degree Criminal Sexual Conduct ("CSC III"). Narruhn argues that he received ineffective assistance of counsel on numerous grounds, in violation of his Sixth Amendment rights. Our review of the record reveals general inaction by Narruhn's trial counsel and raises serious questions about counsel's trial strategy. Although we are troubled by several actions trial counsel took (or failed to take), we conclude the record is not sufficiently complete for this court to make proper findings on the grounds of ineffectiveness raised by Narruhn. We decline to reach the merits of Narruhn's ineffective assistance claims on direct appeal and instruct him to file a petition for a writ of habeas corpus in the Superior Court. We affirm without prejudice to Narruhn's right to raise the ineffective assistance of counsel issue in a habeas corpus proceeding, where an adequate factual record may be developed. We have also appointed Attorney Peter C. Perez as Narruhn's habeas counsel.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

[2]     One night in February 2022, L.C. held a dart tournament at her home in Harmon. The dart tournament lasted all night and did not conclude until five the next morning. There were over 20 people at the house. Sometime early that morning, Narruhn arrived with a group of people that may have included his cousin, and according to L.C., he began to "cause trouble" and act "tough." Transcript ("Tr.") at 9-11 (Jury Trial, Sep. 12, 2023). L.C. and others asked Narruhn to leave,

---

[1] This opinion supersedes this court's Amended Order resolving Narruhn's appeal and appointing habeas counsel. Am. Order at 25-26 (Oct. 20, 2025). This Opinion does not affect that appointment of counsel.

which he did at around three or four in the morning. L.C. testified that before the dart tournament, she had seen Narruhn only three times in the past. Narruhn was an acquaintance of L.C.'s adult son T.C.

[3]       L.C. testified that she went to sleep in her bedroom at around 11 a.m. or noon after the dart tournament ended. She testified that she had locked up the house before going to bed and that her cousin B.S. was the only other person in the house. L.C. testified that she woke up to Narruhn on top of her, engaging in penile-vaginal penetration. L.C. testified that Narruhn also had a pair of scissors held against her back and said words to the effect of "don't scream or else he'll gut me like a fish." *Id.* at 14. L.C. testified that Narruhn stopped after he ejaculated, and that she "didn't say anything" and "just laid there until he left." *Id.* at 15. L.C. stated that as Narruhn exited her room, her cousin B.S. asked him, "What are you doing in there?" *Id.*

[4]       B.S. also testified at trial. According to B.S., only he, his partner, and L.C. were inside the house when he went to sleep around midnight. B.S. was not the first person to whom L.C. reported the assault. B.S. testified that he was awoken by a phone call from his partner, who had left during the night, saying that L.C. had been raped. B.S. stated, "Right when I heard that, I unlocked the door, went outside, and I see [Narruhn] and the other guy coming out from [L.C.'s] room." Tr. at 53 (Jury Trial, Sep. 13, 2023). B.S. thought "the other guy" was a cousin of Narruhn's called "J4." *Id.* B.S. stated that he had never seen Narruhn before and that he was "fogging up" because when he walked outside, there were "like, shit lot of people outside." *Id.* at 55. According to B.S., he asked the two men, "What are you guys doing here?" and "Who the hell are you guys?" *Id.*

[5]       The police were eventually called, arriving at L.C.'s house in the afternoon. A window in the house seemed to have been tampered with, and items on a table below the window had been disturbed.

[6]      One officer drove two blocks away to check for Narruhn at a residence where he had been recently seen.  The officer found Narruhn and spoke with him.  According to the officer, he informed Narruhn he was being accused of CSC by L.C., to which Narruhn responded that he didn't do it, that he barely knew L.C., and that he hadn't been at her house.  According to the officer, Narruhn stated he had been at his cousin's house from 3 a.m. until 2 p.m., and that after that he had then gone to SJ Market with his cousin and cousin-in-law.  The officer testified Narruhn said words to the effect of "he's known for being a fighter" and that "raping is not his M.O."  Tr. at 74 (Jury Trial, Sep. 12, 2023).  Narruhn was then placed under arrest.  Narruhn was ultimately indicted on one charge of Burglary and one charge of CSC III.

[7]      After an initial discussion with the police at her home, L.C. was taken to the Tumon precinct, where she was interviewed by police.  She was then taken to Healing Hearts, where a rape kit was performed.  A rape kit and the clothing L.C. had been wearing were sent to the Guam Police Department ("GPD") and eventually to the FBI Laboratory.

## B.  Pretrial Procedural History

[8]      The Public Defender Service Corporation ("PDSC") was initially appointed to represent Narruhn.  PDSC withdrew from representing Narruhn on March 11, 2022, and the Alternate Public Defender ("APD") was appointed the same day.  Narruhn was arraigned the following week and waived his right to a speedy trial.  At a status hearing on May 4, 2022, the court was informed that Narruhn's appointed attorney, Mr. Lemons, was retiring and that the case would be reassigned within the APD.  The last action taken by Attorney Lemons in the case that appears on the record was moving to compel discovery on May 12, 2022.

//

//

**[9]** The People did not move to compel a DNA sample from Narruhn until October 2022— nearly eight months after he had been arrested and the rape kit was sent to GPD.[2] Although trial had been initially scheduled for November 2022, Narruhn's trial date was pushed to April 2023 because the People claimed they were still waiting on DNA results.

**[10]** A review of the record reveals no further action on defense counsel's part until a pretrial conference was held on March 14, 2023, where APD told the court they were still awaiting DNA results. At a status hearing on May 4, APD again told the court they were waiting on the DNA results, and trial was eventually pushed back to August 2023.

**[11]** The first indication in the record that Narruhn was having issues with his appointed counsel occurred at a pretrial conference on August 4, 2023, when Narruhn asked the trial court if he could dismiss his lawyer. The attorney appointed to represent him, Attorney Ana Maria C. Gayle, was not present; a different attorney from the APD office appeared instead. Narruhn told the court, "I don't know what's going on. . . . I've been in jail for one year and five months." Tr. at 2 (Pre-Trial Conf., Aug. 4, 2023). When the court asked what the issue was about, Narruhn asked, "Can I speedy trial? I've been asking to speedy trial and they never want to." *Id.* The court asked, "You're asking for a speedy trial?" and Narruhn answered, "I've been asking, Your Honor. . . . I called, they never come." *Id.* at 2-3. The following exchange then occurred:

> THE COURT: In this matter, Mr. Narrhun [sic] has just spoken out about wanting to be speedy trial asserted. The Court at this time will make a record for that.
>
> It's one thing to leave a message, Mr. Narrhun [sic], and if you don't get a call back, that's different. But you're not telling me right here --
>
> DEFENDANT: I'm telling you, Your Honor.

---

[2] It seems that the DNA sample was not obtained from Narruhn until May 2023—over a year after he was arrested. Tr. at 3 (Status Hr'g, Aug. 25, 2023).

THE COURT: Listen. You're not telling me like -- here in court, for instance, with your lawyer, that you asserted and they said, "Cannot assert."

DEFENDANT: I've been telling them --

THE COURT: But are you asserting right now?

DEFENDANT: Yes.

THE COURT: Okay, then you are now asserted.

DEFENDANT: Yes, please.

*Id.* at 3. The trial court then set a *Nguyen*[3] hearing to consider Narruhn's request to fire his appointed counsel.

[12] Attorney Gayle appeared at a status hearing the following Monday. After Narruhn's case was called, the trial court recalled that Narruhn had asserted his speedy trial right and asked for a new attorney, and additionally stated, "I'm hearing that he's being problematic downstairs, calling out other detainees." *Id.* at 2. Attorney Gayle stated, "Well, if he's going to be problematic, I don't want to be around him. He won't want to talk to me." *Id.* After further discussion, Attorney Gayle agreed to speak with her client while the court called other cases. *Id.* at 2-3. When they went back on the record, Narruhn was in the courtroom, and the court asked him, "[Y]ou haven't really otherwise met with your attorneys, correct, about this case?" *Id.* at 4. Narruhn responded, "Never." *Id.* The court then turned to the DNA evidence, which had yet to be tested. *Id.* at 5. The prosecutor stated that the FBI was still analyzing it but acknowledged that it did not toll speedy trial. *Id.* Attorney Gayle added, "I did talk to [Narruhn] when we were downstairs and I explained what the situation was, and I explained about the DNA, and I explained about -- we were just --

---

[3] This is a reference to *United States v. Trung Tran Nguyen*, 262 F.3d 998 (9th Cir. 2001), where the Ninth Circuit held, "For an inquiry regarding substitution of counsel to be sufficient, the trial court should question the attorney or defendant 'privately and in depth,' and examine available witnesses." *People v. Libby*, 2021 Guam 27 ¶ 20 (quoting *Nguyen*, 262 F.3d at 1004).

we've been in a holding pattern because of that. He still insists that my office not represent him . . . ." *Id.* at 6.

[13]    The following day, the trial court held a *Nguyen* hearing where it discussed Narruhn's issues with counsel on the record and outside the presence of his attorney. The court told Narruhn:

> I'm trying to find out to what degree you had any discussions with your lawyers . . . . I want to know to what extent you guys got into a relationship that might be broken or you didn't even have a chance to have a relationship, that's what I'm trying to inquire about now with you, Robby. So what's the situation with the current Alternate Public Defenders?

Tr. at 2-3 (Status Hr'g, Aug. 8, 2023). Narruhn answered, "I don't know any status of my . . . . They never came." *Id.* at 3. After additional inquiry, Narruhn stated the last discussion he had with an attorney from APD was about a plea deal in March, five months prior. *Id.* at 3-4. The court encouraged Narruhn to postpone the decision to fire his attorney until he discussed his case with them and got the information necessary to make a decision. *See id.* at 4. Narruhn stated he was prepared to talk with his attorney if they were available. *Id.* at 4-5.

[14]    The trial court then had a discussion on the record with Attorney Gayle outside the presence of Narruhn.[4] The court stated, "My assessment was that he just has not had enough time at all to discuss matters with counsel and that he is prepared to have discussions with counsel regarding his case . . . ." Tr. at 2 (Excerpt Status Hr'g (*Nguyen* Hr'g), Aug. 8, 2023). The court then asked Attorney Gayle, "[T]o the extent you had some conversations, what do you believe is the status of the relationship?" *Id.* Attorney Gayle responded that Attorney Lemons was his original lawyer and that Lemons had communicated to Narruhn that APD was waiting for the DNA results, and initially Narruhn "was fine with that." *Id.* She then stated that because it was taking so long to

---

[4] Perhaps contrary to the Ninth Circuit's admonition in *Nguyen* that "the trial court should question the attorney or defendant 'privately and in depth,'" *Libby*, 2021 Guam 27 ¶ 20 (quoting *Nguyen*, 262 F.3d at 1004), this discussion took place with the prosecution present.

get the DNA testing, they were in "a holding pattern," and when Narruhn would call APD's office, he was told they were waiting for the DNA results. *Id.*

[15]     Attorney Gayle stated that "he's just one of those people no matter what -- when I talk to him now, I mean, he's saying, 'I don't want you on my case because you don't know what you're doing.'" *Id.* at 2-3.  She stated that Narruhn and Attorney Lemons had a "little issue" in the past, but they had cleared it up.  *Id.* at 3.  The court clarified, asking, "So you haven't had extensive interactions with him on this matter recently?"  *Id.*  Attorney Gayle answered, "No, because we were waiting for the -- DNA. . . .  And it hadn't been asserted."  *Id.*  Attorney Gayle also mentioned that Narruhn may not have been informed that APD had received some discovery from the government.  *Id.* at 4-5.  She also mentioned that APD had asked the government for any evidence from the market Narruhn claimed he had been at, and she needed to let Narruhn know they had no video.  *Id.* at 5.  She told the trial court that "[t]he alibi's not set."  *Id.*  The court concluded, "My conversation with him, combined with mine with yours, gives me the impression that the relationship is not irretrievably broken."  *Id.* at 6.  Attorney Gayle responded, "No, it's not.  He's just being a crybaby."  *Id.* at 7.  The trial court replied that "he wants certain attention, which is appropriate that he should -- and I told him there will be lots of meetings now as he prepares for trial . . . ."  *Id.*  The court set trial for September 11, 2023.  *Id.*

[16]     Several more status hearings were held where the trial court emphasized to the prosecution the importance of obtaining the DNA results.  APD filed no substantive pretrial motions.  Eventually, the DNA analysis was completed by FBI Forensic DNA Examiner Karla Wright less than two weeks before trial.[5]  On September 7, 2023, Narruhn's counsel stipulated to Wright

---

[5] It is not clear from the record when defense counsel received the report.  At a status hearing on August 25, the prosecutor stated the analysis had been completed but the report had not yet been released.  Tr. at 2-5 (Status Hr'g, Aug. 25, 2023).  On August 29, the People supplemented their witness list to include Wright, RA, tab 75 at 1 (People's

testifying via Zoom. Additionally, defense counsel stipulated to the "validity and admissibility of the DNA test results." RA, tab 79 at 1 (Stip. re: DNA Evid. & Remote Expert, Sep. 7, 2023). The stipulation was signed by Attorney Peter J. Santos, who took over the case from Attorney Gayle and was lead chair.

## C. Trial Proceedings

[17] A jury was selected, and opening statements were given on September 11, 2023. During the People's opening statement, they emphasized that Narruhn had told police he was not at L.C.'s house, but the DNA evidence would provide strong support for his inclusion as the source of the DNA found in the rape kit. The prosecutor stated, "So his story was that he wasn't there. But then his DNA ends up in her cervix. And so at this point, I'm not sure actually what the Defense[,] if they think right now is consent, because his DNA is there." Tr. at 157 (Jury Selection & Opening Stmts., Sep. 11, 2023). The prosecution's theory was that Narruhn had entered L.C.'s home through the window and then raped her. Attorney Santos gave a brief opening statement that did not present a coherent theory of defense and did not seem to indicate whether Narruhn was arguing consent.

[18] As part of their case-in-chief, the prosecution called L.C., L.C.'s goddaughter V.A., L.C.'s cousin B.S., and Officer Derrick F. Atan as fact witnesses. The narratives given by L.C., V.A., and B.S. were to some extent contradictory.[6]

[19] Defense counsel probed none of the fact witnesses, including L.C. herself, on whether Narruhn and L.C. were in an intimate relationship or whether any sexual contact had been

---

Suppl. Witness List, Aug. 29, 2023), but later filings seem to indicate Wright's report was dated August 30, RA, tab 79 at 1 (Stip. re: DNA Evid. & Remote Expert, Sep. 7, 2023).

[6] The major difference in V.A.'s testimony was that according to her, a third person was in the house while the events unfolded: L.C.'s adult son T.C. But as T.C. passed away months before trial, this claim was not explored further.

consensual. Although defense counsel did not ask L.C. about consent, it seems that defense counsel intended to impeach her with statements she made to police that were contained in a police report.[7] But the officer who prepared the police report was off island at the time of trial, so it appears defense counsel planned to rely on the police report being admitted into evidence under an exception to the rule against hearsay. *See* Tr. at 119 (Jury Trial, Sep. 13, 2023) ("[I]t's an exception to the hearsay rule when someone is not available."). However, the trial court correctly concluded that a mere showing of unavailability was insufficient, and that while there are specifically enumerated exceptions for certain types of statements by an unavailable witness, none applied to the police report. *See id.* at 122 ("It's not former testimony, it's not a statement under the belief of imminency of death, not a statement against interest, and there are but a few others. . . . [T]he Court cannot see to admit this, what otherwise would be simple and pure hearsay.").

[20] The People also called the owner of SJ Market, William S.H. Moon, as a witness. Moon's testimony revealed that the security camera that covered half of the parking lot was not working, and the other half was blurry. The investigator from the Office of the Attorney General gave Moon a mugshot of Narruhn and the color of the clothes he was wearing, but no other information, including Narruhn's claim that he was with two other people. The investigator did not watch the footage. Moon said, "I talked to them, I'm not sure, because I tried to check, but I'm not sure. I don't have information enough at that time . . . ." Tr. at 64 (Jury Trial, Sep. 12, 2023).

[21] The People also called four expert witnesses: Dr. William Weare; then-director of Healing Hearts Crisis Center, Maria Teresa Aguon; GPD's criminalist Zenobia Lynn; and DNA expert

---

[7] Specifically, defense counsel asked L.C. whether she told police (1) she shouted for Narruhn to get out, (2) she shouted to get B.S.'s attention, (3) Narruhn stole bowl ramen, and (4) Narruhn came back and touched her. Tr. at 31 (Jury Trial, Sep. 12, 2023). Counsel also asked why she never told police that Narruhn said he was going to "gut her like a fish." *Id.*

Karla Wright (via Zoom). Aguon and Dr. Weare also had personal knowledge of L.C.'s condition, as they performed the intake and examination at Healing Hearts, respectively.

[22] The People's DNA expert, Karla Wright, testified that she had bachelor's degrees in biology and chemistry and a master's in business administration. When the People moved to designate Wright as an expert in DNA analysis, the court asked defense counsel if they had any voir dire or response, and Attorney Santos replied, "No, Your Honor. We reviewed her CV. No objection." Tr. at 9 (Jury Trial, Sep. 13, 2023). Wright testified that "the DNA results from the vaginal swabs are seven point three octillion times more likely if [L.C.] and Mr. Narrhun [sic] are contributors than if [L.C.] and an unknown, unrelated person are contributors."[8] *Id.* at 21. Wright also testified that "the DNA results from the cervical swabs are two point nine octillion times more likely if [L.C.], Mr. Narrhun [sic], and an unknown, unrelated person are contributors than if [L.C.] and two unknown, unrelated people are contributors." *Id.* at 24. Wright stated that to calculate these likelihood ratios, she used a population database that included African American, Caucasian, southeastern Hispanics, southwestern Hispanics, Chamorro, and Filipino populations. Wright admitted on direct examination that the likelihood ratio would be inflated if an individual comes

---

[8] Seven octillion is a 7 followed by 27 zeroes. As the Kentucky Supreme Court has explained:

> The significance of a match or a partial match depends upon how rare or how common the profile or partial profile is. Population geneticists have amassed data bases for the commonly tested polymorphic sites, such as those in the CODIS [Combined DNA Identification System] standard, which enable them to estimate the frequency with which the various alleles occur in the general United States population and in certain subsets of the population. Those estimates then allow the calculation of the frequency with which a given profile occurs. That frequency is often expressed as the "random match probability" or the odds that an unrelated person chosen at random from the reference population would have the given profile. For large profiles, such as those based on the twenty-six alleles of the thirteen CODIS sites, the random match probability is frequently vanishingly small, one chance in billions or trillions or quadrillions. In such cases a very strong inference arises that the matching known and unknown samples came from the same source. For smaller profiles, however, those based on partial matches, say, at only a few sites, the odds of a random match can be much higher and the inference that the source of the known sample was also the source of the unknown sample much weaker.

*Duncan v. Commonwealth*, 322 S.W.3d 81, 89-90 (Ky. 2010) (citations omitted).

from a population not represented in the database used to perform the statistical analysis. On cross-examination, defense counsel brought to Wright's attention that Narruhn is Chuukese, and she confirmed that the database she used to calculate the likelihood statistics had no Chuukese population. She also clarified that she performed none of the laboratory examinations herself; she just interpreted the results from the biologists who did the lab work and wrote her report.

[23]    After the People rested, defense counsel moved for a judgment of acquittal but seemed to concede that it would not be appropriate on the CSC charge: "[T]here is still much argument to be made whether or not there was consent. So, I guess for the CSC Charge, I can't -- we can't make a strong argument for a directed verdict on that. But we do request a directed verdict on the burglary Charge." *Id.* at 114. Despite this concession, the trial court considered the motion as to both charges and concluded that both could properly be submitted to the jury. The defense presented no witnesses, with trial counsel correctly expressing during closing arguments that Narruhn was under no obligation to call witnesses or produce evidence. *See* Tr. at 32 (Jury Trial, Sep. 14, 2023) ("We didn't have any witnesses. . . . So I'm not saying that I should've just sat there and did nothing. . . . But, make no mistake, he doesn't have to bring witnesses. He doesn't have to bring evidence.").

[24]    During the People's closing argument, they emphasized that no matter the contradictions in witness testimony, "[a]ll of this doesn't even matter because at the end of the day we found the DNA." *Id.* at 19; *see also id.* at 23 ("Like, if this woman, you don't think she should be trusted but for the DNA, and it turns out she was correct that there was a sexual encounter because there was DNA, because remember, it was a he said-she said until we had DNA, then all of a sudden it was consent."). The People stated, "I think the defense in this case was no, I didn't do it but if it was me, it was consensual." *Id.* at 20. The prosecutor continued:

Remember in opening arguments, I was, like, I don't even know what the theory is. . . . But I think throughout the course of the evidence here that was presented, Mr. Santos, you know, threw out questions . . . hinting that this was consensual. Again, [L.C.] did not talk about that at all. . . .

. . . .

But here's what I think the defense's theory is, something like, well, [L.C.] cannot be trusted because she was a drug user in the past and therefore she's lying now. But I still don't know why. And so we're thinking about what motive does [L.C.] have to lie about things because from all the witnesses that I put up, everybody who's (indiscernible 1:10:36) there was no testimony about anything that would hint to why she would just randomly point her son's acquaintance as being the person who raped her. There is no evidence in this. He said she's lying like she -- I mean, really, you would have to believe that she's just trying to wreck a random person's life for nothing.

*Id.* at 20-21.

[25]    Defense counsel's closing argument was much more disjointed and at times seemed unreasonable. *See id.* at 36 ("[S]omeone might lie about stealing a cookie, but they're not going to lie about lighting a dog on fire."); *id.* at 38 ("Today's marijuana is not your grampa's marijuana."). Attorney Santos began by arguing the burden of proof and then speculating about whether L.C. was under the influence of drugs at the time of the event. He then admitted that Narruhn and others were in L.C.'s house but argued that the People failed to prove that they had broken in through the window, as opposed to being let inside. Defense counsel then speculated why L.C. might be lying: "You know, there's a lot of possibilities. You know, it is possible she let them in. It is possible they were partying. . . . Well, maybe someone stole some money and some stuff. What is this 'stuff'? Is it a drug deal gone bad?" *Id.* at 35-36. Attorney Santos also conceded that Narruhn initially lied to police but argued that "just because he didn't want it known that him and [L.C.] had sex doesn't mean that he's lying about whether or not it was consensual." *Id.* at 36. Defense counsel then returned to speculating about L.C.'s potential drug use before concluding his disjointed closing by attempting to address the prosecutor's comment that she did

not know what the theory of defense was, stating that "our theory" was that "this was not a burglary and not a rape. This is a couple of people partying and, you know, Mr. Narrhun [sic] is not an angel. He's an asshole, but you don't have to like him. You know, this could have been a drug deal gone bad, and that's the bad blood." *Id.* at 38. On rebuttal, the prosecution stated, "So there is a reason why anything we say in opening and closing is not evidence. Most, like ninety percent, of what Mr. Santos said had no basis in the testimony." *Id.* at 39.

[26]    The jury was then instructed on the law, including a consent instruction requested by defense counsel. After deliberating, which included listening to playback of the testimony from L.C., B.S., and V.A., the jury returned a verdict of guilty on all charges the following day. The court sentenced Narruhn to eight years on both charges, to be served consecutively. Narruhn timely appealed.

## II.  JURISDICTION

[27]    This court has jurisdiction over a criminal appeal from a final judgment of conviction. 48 U.S.C.A. § 1424-1(a)(2) (Westlaw through Pub. L. 119-47 (2025)); 7 GCA §§ 3107, 3108(a) (2005); 8 GCA §§ 130.10, 130.15(a) (2005).

## III.  STANDARD OF REVIEW

[28]    "Ineffective assistance of counsel claims are mixed questions of law and fact, which we review *de novo*." *People v. Cruz*, 2023 Guam 1 ¶ 7 (quoting *People v. Guerrero*, 2017 Guam 4 ¶ 18). "Although an ineffective assistance of counsel claim may be heard on direct appeal, these claims are typically more appropriately brought on a petition for a writ of habeas corpus, as these claims usually require an 'evidentiary inquiry beyond the official record.'" *Id.* (quoting *People v. Leon Guerrero*, 2001 Guam 19 ¶ 12). "This court has, however, reviewed ineffective assistance

of counsel claims if the record is 'sufficiently complete to make a proper finding.'" *Id.* (quoting *People v. Moses*, 2007 Guam 5 ¶ 9).

## IV. ANALYSIS

[29]    Narruhn raises ten individual grounds for finding his counsel ineffective, plus a claim these cumulatively amount to ineffective assistance.  Although the merits of these claims vary, they paint the APD in an unflattering light.[9]  The record is insufficiently complete to make a proper finding on the merits of Narruhn's ineffective assistance claims on direct review, but several of trial counsel's decisions deserve further scrutiny based on the limited record before us.

[30]    The Sixth Amendment, which has been extended to Guam by the Organic Act, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI; 48 U.S.C.A. § 1421b(u).  "The right to counsel is necessarily 'the right to the effective assistance of counsel.'"  *People v. Titus*, 2020 Guam 16 ¶ 19 (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)).  "The Sixth Amendment guarantees a defendant the right to the effective assistance of counsel at all critical stages of a criminal proceeding, which is 'any "stage of a criminal proceeding where substantial rights of a criminal accused may be affected."'"  *People v. Libby*, 2021 Guam 27 ¶ 24 (quoting *Hovey v. Ayers*, 458 F.3d 892, 901 (9th Cir. 2006)).  The right to counsel has never been "conditioned upon

---

[9] As the authors of the treatise Ineffective Assistance of Counsel point out:

> It is, however, unfair and misleading to suggest that the collective incompetence of all criminal defense counsel is the primary reason for the supposed pervasiveness of ineffectiveness. As one commentator has pointed out, "[m]any ineffective assistance problems are systemic problems: poor appointment systems, weak and underfinanced public defender and defense support systems, a weak defense bar, and undertrained attorneys . . . [E]ven skilled counsel may be made ineffective by a lack of time or money."  Or, as a federal district court judge commented: "Because of the pressures of staggering case loads and limited resources, the criminal justice system frequently produces marginal performances by counsel."

John M. Burkoff & Nancy M. Burkoff, *Ineffective Assist. of Counsel* § 1:7 (Apr. 2025 Update) (alterations in original) (footnotes omitted).

actual innocence. The constitutional rights of criminal defendants are granted to the innocent and the guilty alike." *Kimmelman v. Morrison*, 477 U.S. 365, 380 (1986).

[31] "[W]e have repeatedly held that an ineffective assistance of counsel claim is better heard under a writ of habeas corpus because [such a] claim typically requires an evidentiary hearing." *People v. Taisacan*, 2023 Guam 19 ¶ 59. This is "because the trial record often lacks a sufficient evidentiary basis as to what counsel did, why it was done, and what, if any, prejudice resulted." *People v. Campbell*, 2006 Guam 14 ¶ 47. "The inverse of this general rule is that the merits of an ineffective assistance claim may be appropriate for direct review if the record is sufficiently complete to make a proper finding." *Id.*

[32] We conclude that the merits of Narruhn's ineffective assistance claims are inappropriate for direct review because the record is insufficiently complete to make proper findings. Although we conclude the record is insufficient to determine whether counsel failed to engage with Narruhn, we are bothered by the facts of this case. Similarly, the record is incomplete to determine if counsel failed to investigate or present a defense strategy, but our review raises concerns. Finally, we are troubled by the handling of DNA evidence in recent prosecutions of Micronesian defendants, but we conclude the record is insufficient to reach this claim on direct appeal. Because we conclude the record is insufficient on all of Narruhn's non-frivolous claims, we affirm without prejudice to Narruhn's right to raise ineffective assistance of counsel in a habeas corpus proceeding.

## A. The Record Is Insufficiently Complete to Determine Whether Counsel Failed to Engage with Narruhn

[33] Narruhn claims the record shows that "[a]s of August 4, 2023, Counsel had not engaged with Narruhn for one year and five months." Appellant's Br. at 19 (May 28, 2024). The People point to various points in the record they claim show counsel's engagement with Narruhn. Appellee's Br. at 15 (Aug. 12, 2024). Although we conclude the record is insufficient to resolve

these competing characterizations of counsel's engagement with Narruhn, we are troubled by the facts of this case.

[34]     Narruhn contended that appointed counsel had not engaged with him for nearly a year and a half at a pretrial conference where he requested to fire his attorney.  The trial court took this allegation seriously and held hearings separately with Narruhn and defense counsel.  Although the court asked about counsel's prior level of engagement, the inquiry primarily focused on whether the relationship between Narruhn and counsel was irretrievably damaged going forward.  Attorney Gayle made unflattering comments during the hearing when her client was not present: "No, [the relationship is] not [irretrievably broken].  He's just being a crybaby."  Tr. at 7 (Excerpt Status Hr'g (*Nguyen* Hr'g)).  Her reticence to engage with Narruhn can be gleaned from the record, but additional context is missing.  *See* Tr. at 2 (Status Hr'g, Aug. 7, 2023) ("Well, if he's going to be problematic, I don't want to be around him.  He won't want to talk to me.").  Without more, we would have to speculate on counsel's pretrial engagement with Narruhn to make a finding on ineffectiveness.

[35]     Even taking Narruhn's allegations as true that he had no contact with counsel for seventeen months after he was indicted, we would need to know the reason(s) there was no contact to make a finding on ineffective assistance.  Counsel is not deficient where a lack of communication is because of the defendant's unwillingness to cooperate.  *See United States v. Hamilton*, 792 F.2d 837, 839 (9th Cir. 1986) ("Our review of the record indicates, however, that any lack of communication between [defendant] and his attorney prior to trial resulted from [defendant]'s unwillingness to cooperate and his efforts to delay the trial.").  The record does not give us much insight on the reasons for the alleged breakdown in communication.  While Narruhn told the trial court that he had "been asking [his attorneys] to speedy trial and they never want to," and that he

called his attorneys, but "they never come," Tr. at 2-3 (Pre-Trial Conf., Aug. 4, 2023), Attorney Gayle's statements during the *Nguyen* hearing suggest that there was some communication between APD and Narruhn, Tr. at 2 (Excerpt Status Hr'g (*Nguyen* Hr'g)) ("[H]e would call, but it's like well, 'We're waiting for the --' 'What are we waiting for?  What are we waiting for?'  I'm like, 'I tell you, we're waiting for the DNA testing.'  So, he's -- he wants to hurry up but not hurry up and then he gets mad if I don't call him right away and -- which is understandable.  He's been in custody.").

[36]    In *United States v. Cronic*, 466 U.S. 648 (1984), the Court observed that there are "circumstances that are so likely to prejudice the accused" that prejudice may be presumed.  *See* 466 U.S. at 658.  Although courts have intimated that prejudice may be presumed "when there has been a 'complete breakdown in communication between an attorney and client,'" the record is insufficient for this court to determine whether there was "a severe and pervasive conflict with his attorney" or "such minimal contact with the attorney that meaningful communication was not possible."  *See United States v. Holloway*, 939 F.3d 1088, 1097-98 (10th Cir. 2019).

[37]    A review of the record also reveals that Narruhn's contentions about asserting his speedy trial rights raise significant issues, but the record is not fully developed.  There is authority that counsel can be ineffective if they make an unreasonable decision not to assert a defendant's speedy trial rights.  *Remak v. State*, 142 So. 3d 3, 6 (Fla. Dist. Ct. App. 2014).  For instance, under Florida case law, a defendant shows prejudice if "the State could not have brought the movant to trial within the recapture window . . . or [if] the quality of the State's case within the recapture window would have been diminished so severely that there is a reasonable probability that the movant would have been acquitted or convicted of a lesser crime if the State had been forced to proceed."  *Id.* (citations omitted).  The People conceded that waiting for the DNA results did not toll speedy

trial, and had Narruhn asserted earlier, the People may have been forced to proceed to trial without the DNA results. Additionally, much of the delay can be attributed to the People, as Narruhn was in custody for nearly eight months before the People sought a court order to obtain a DNA sample, RA, tab 52 at 1 (People's Mot. Compel DNA Sample, Oct. 7, 2022), and seemingly over a year before the People obtained that sample and submitted it for testing, Tr. at 3 (Status Hr'g, Aug. 25, 2023). Arguably, there is a reasonable probability that Narruhn would have been acquitted or convicted of a lesser crime had the People been forced to go to trial without the DNA evidence.

[38]     But there is authority that when counsel communicates with the defendant and they agree "that waiting for the DNA results would be beneficial for the defense," counsel's failure to assert their client's speedy trial right is objectively reasonable. *See State v. Jones*, 977 N.W.2d 177, 193-94 (Minn. 2022). Although counsel made representations that they had not asserted because they were waiting for the DNA results, the record is unclear if this was communicated to Narruhn and if this was a decision that he agreed with. Attorney Gayle made representations that this had been communicated to Narruhn and that he initially agreed to waiting, Tr. at 2 (Excerpt Status Hr'g (*Nguyen* Hr'g)), but it is conceivable that Narruhn may have changed his mind about waiting as the months dragged on while he remained incarcerated. Given that defense counsel did not seem to think Narruhn's alibi defense was worth investigating,[10] it is not clear whether the DNA results could have reasonably been expected to be favorable.

[39]     Despite the concerns generated by our review of the record, we decline to address this issue on direct appeal because of the inadequacy of the record.

//

//

---

[10] It seems that trial counsel was content to take the prosecution at their word when they said there was no video of Narruhn at SJ Market. *See* Tr. at 5 (Excerpt Status Hr'g (*Nguyen* Hr'g), Aug. 8, 2023).

**B. Our Review Raises Concerns, but the Record Is Incomplete to Determine if Counsel Failed to Investigate or Present a Defense Strategy**

[40]    Narruhn argues that "Counsel did not develop or present any defense consistent with Narruhn's statements to the police, at trial.  Although Narruhn denied the allegations, . . . Counsel presented an inconsistent and implausible defense conceding Narruhn's presence during the alleged incident and that sexual intercourse occurred but arguing it was consensual . . . ."  Appellant's Br. at 24-25.  He claims that "Counsel presented the jury with two obvious and opposite narratives from the defense" and that because "there was no consistent, comprehensible, or credible defense or narrative . . . conviction was inevitable."  *Id.* at 26.  Although it is especially difficult for a defendant to challenge strategic decisions of trial counsel, especially on direct appeal, this case comes close.

**1.  Defendants face considerable difficulty showing counsel's tactics were unreasonable**

[41]    This court has stated that "[w]here counsel consciously decides to omit a defense or pursue a certain argument, such conduct is deliberate strategy, and a choice of strategy that backfires is not the equivalent of ineffective assistance of counsel."  *Mendiola v. Ishizaki*, 2019 Guam 26 ¶ 23 (quoting *Angoco v. Bitanga*, 2001 Guam 17 ¶ 9).  As a leading treatise observes:

> Although one of the most common claims raised by disgruntled defendants, counsel's failure to make a particular argument or assert a particular defense is rarely a successful basis for proving ineffective assistance of counsel.  Because the decision to make an argument or assert a specific defense is at the heart of trial strategy, defendants face considerable difficulty in showing that counsel's tactics were unreasonable under the first Strickland prong.

John M. Burkoff & Nancy M. Burkoff, *Ineffective Assist. of Counsel* § 7:1 (Apr. 2025 Update).  The U.S. Supreme Court has reiterated that "[a]n attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy.  That obligation, however, does not require counsel to obtain the defendant's consent to 'every

tactical decision.'" *Florida v. Nixon*, 543 U.S. 175, 187 (2004) (citations omitted). To succeed on an ineffective assistance claim, a defendant must show there was no reasonable basis for failing to present a defense supported by the evidence, *see, e.g.*, *Commonwealth v. Moore*, 805 A.2d 1212, 1218 (Pa. 2002); *Bryant v. Comm'r of Corr.*, 964 A.2d 1186, 1198 (Conn. 2009), or that trial counsel essentially presented no theory of defense at all, *see, e.g.*, *Fisher v. Gibson*, 282 F.3d 1283, 1306 (10th Cir. 2002) (finding counsel ineffective where he "failed in general to advance any defense theory, even that of reasonable doubt"); *State v. Barrett*, 263 S.W.3d 542, 548 (Ark. 2007) ("[I]t is apparent from the record that [counsel] never developed a trial strategy at all."); *Matthews v. Abramajtys*, 319 F.3d 780, 789 (6th Cir. 2003) ("Fundamentally, the lawyer in this case, at best, occupied a space next to his client but did not assist him. He did nothing to present potential alibi witnesses, whose testimony would have been quite useful, even if not conclusive. The trial court pretty clearly pointed out to counsel what he needed to do in order to be even minimally effective, after the denial of his motion for directed verdict: present some defense witnesses.").

[42]    Defendants have more success showing their counsel pursued an unreasonable strategy when they support the claims with evidence that trial counsel performed inadequate pretrial investigation. *See* Burkoff & Burkoff, *supra*, § 6:35. The *Strickland* decision itself centered on trial counsel's abject failure to perform any investigation, with the Court holding that:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91. Thus, in addition to the duty to present some theory of defense at trial, counsel is also under a duty to perform a reasonable investigation into potential defenses.

### 2. Our review raises questions, but the record is insufficient on counsel's trial tactics

[43] When this court has reached ineffective assistance claims regarding trial tactics, it has done so with the benefit of evidentiary hearings on trial counsel's strategic decisions. *See Mendiola*, 2019 Guam 26 ¶ 23; *Angoco*, 2001 Guam 17 ¶ 10. In *People v. Damian*, 2016 Guam 8, this court observed that "Damian's first assertion concerns the intricacies of trial counsel's defense strategy. . . . In order to prevail, Damian would need to establish that the decisions about which he complains were not made for strategic purposes but out of a lack of diligence or for some illegitimate motive." 2016 Guam 8 ¶ 31. This court ultimately concluded that "[s]uch a finding cannot be gleaned from the record and therefore requires a separate fact-finding proceeding, more appropriately conducted pursuant to a writ of habeas corpus." *Id.* (citing *People v. Meseral*, 2014 Guam 13 ¶ 49).

[44] A review of the record could lead one to question the zealousness of defense counsel's advocacy, although it seems by the time of closing arguments, trial counsel had settled on a strategy. Narruhn concedes as much, arguing there was no "coherent or consistent" theory of defense, Appellant's Br. at 23, which is a tacit admission there was at least an incoherent or inconsistent theory of defense. However haphazard, during closing arguments, defense counsel relied on the burden of proof and consent as theories of defense. The record is insufficiently developed to determine whether this choice was "made for strategic purposes [or] out of a lack of diligence or for some illegitimate motive." *See Damian*, 2016 Guam 8 ¶ 31.

[45] Perhaps most important, the record is unclear as to when trial counsel adopted this strategy. In rebuttal, the prosecutor criticized defense's closing when she observed that "ninety percent" of

it had no basis in the record. Tr. at 39 (Jury Trial, Sep. 14, 2023). Although it would be trial strategy to choose to rely on a consent theory, it is arguably not a reasonable trial strategy to adopt a theory of defense in closing without presenting any supporting evidence during the evidentiary phase of the trial. *See People v. Quintanilla*, 1998 Guam 17 ¶ 14 ("Counsel's error cannot be deemed trial strategy due to the fact that he proceeded to allude to the cell-mate defense in closing arguments even after failing to present any supporting evidence during the evidentiary phase of the trial.").

[46]     A trial decision made based on trial counsel's lack of familiarity with established evidence law is based "not on strategy, but on mistaken beliefs and 'a startling ignorance of the law.'" *Blackburn v. Foltz*, 828 F.2d 1177, 1182 (6th Cir. 1987) (quoting *Kimmelman*, 477 U.S. at 385). Defense counsel's "strategic" decision may have been not to directly attack L.C.'s credibility but instead attempt to impeach her using other witnesses and the statements she gave to police; but if that decision was based on the mistaken belief that a police report would be admissible upon a mere showing the officer was unavailable, such a choice was erected upon a "rotten foundation." *See Ramonez v. Berghuis*, 490 F.3d 482, 488 (6th Cir. 2007). A witness that goes missing during trial puts counsel in a difficult position, but the record is not clear whether trial counsel knew the author of the police report would be unavailable before trial, nor whether he made "strategic" decisions under the mistaken belief the report would be admissible.[11]

---

[11] Our review of the record reveals what appears to be a profound ignorance of the Rules of Evidence on defense counsel's part when he attempted to have the report admitted:

> MR. SANTOS:  [I]t's an exception to the hearsay rule when someone is not available.
>
> The trustworthiness of the document, it is a police report made in [p]reparation for law enforcement purposes in the investigation of an alleged crime. . . . [T]here's nothing to indicate that what he wrote is not trustworthy. And likewise if he's deemed unavailable for purposes of this trial, then that would be an exception to the hearsay rule.
>
> MS. TENORIO:  Well, Your Honor, being unavailable is not, in and of itself, an exception to the hearsay rule. You still have to fall under a hearsay exception. And even though Mr. Santos

[47]    That trial counsel did not refer to consent in his opening statement—even after the prosecution raised consent—in addition to not questioning L.C. about consent, at least raises the question whether counsel began trial without having decided on the theory of defense.  From beginning to end, the prosecution stated that they did not know Narruhn's theory of defense, and our review of the record shows trial counsel did little to resolve that confusion in the minds of the jurors.

### 3. Because the record is not fully developed, a collateral proceeding is appropriate to determine if counsel's pretrial investigation of potential defenses was deficient

[48]    Another troubling aspect of trial counsel's conduct is the alleged lack of investigation and preparation before trial.  "An attorney must at a minimum interview potential witnesses and make an independent investigation of the facts and circumstances in the case. . . .  Counsel's obligation is to conduct a reasonable inquiry into all plausible defenses." *State v. Newman*, 966 N.W.2d 860, 870 (Neb. 2021); *see also Commonwealth v. Baker*, 800 N.E.2d 267, 276 (Mass. 2003) ("[T]rial

---

is talking about the trustworthiness, that's the residual exception.  And all courts around . . . the nation -- have rules that police reports are not trustworthy. . . .

. . . .

THE COURT:  (Heavy sigh).  You want to identify any authority, particular [sic] the Rule on availability, unavailability?

MR. SANTOS:  Your Honor, I believe -- I don't have my green book with me, but I believe the Court should determine whether or not -- or, can determine whether or not a witness is available or unavailable for purposes of trial . . . .

. . . .

THE COURT:  All right.  The Court's determination is that there are exceptions available when there's a determination of unavailability.  But they're enumerated and the Court doesn't find that any of them, at this time, do exist.  If you look to 804(a) and (b), you have, again as you iterated, Attorney Santos, there's criteria for being unavailable and the Court appreciates that, again, while there may be some determination of unavailability, maybe both of you had sought to procure him as a witness but were not able to, this lengthy absence from the island is the explanation.  But it's -- you might have that but you don't have any of the exceptions applying.  It's not former testimony, it's not a statement under the belief of imminency of death, not a statement against interest, and there are but a few others. . . .  [T]he Court cannot see to admit this, what otherwise would be simple and pure hearsay.

Tr. at 119, 121-22 (Jury Trial, Sep. 13, 2023).

counsel was under a duty imposed by both State and Federal constitutional law to conduct an independent investigation of the facts, including an investigation of the forensic, medical, or scientific evidence on which the Commonwealth intended to rely to prove the defendant's guilt." (citations omitted)); *Dees v. Caspiri*, 904 F.2d 452, 454 (8th Cir. 1990) (per curiam) ("Considering the importance of the shoe print evidence in this case, counsel had a duty to make a diligent investigation of the forensic evidence and its potential weaknesses."). Based on the arguments and record before us, Narruhn's trial counsel may have been content to rely on the prosecution's investigation, both regarding a potential alibi defense and DNA evidence. In some cases, this is not considered "adequate investigation." *See Thomas v. Lockhart*, 738 F.2d 304, 308 (8th Cir. 1984) (concluding attorney's performance deficient where he relied solely on prosecution's file, medical reports, and interviews with defendant where defendant consistently maintained his innocence and denied statements made to police).

[49]   It is not clear from the record whether defense counsel performed any pretrial investigation into Narruhn's alibi or pursued their own DNA expert. The testimony elicited at trial from the owner of SJ Market casts doubts on the reasonableness of a decision to rely on the prosecution's halfhearted attempt to investigate Narruhn's alibi. The record shows that Narruhn claimed to be with two other people at the time of incident, but one cannot glean from the record whether defense counsel attempted to interview these people and why he chose not to put them on the stand.[12] The APD consistently claimed it was in a holding pattern while waiting for the FBI to complete its DNA testing. Still, there is nothing in the record to explain why they waited for a year and a half without taking action regarding the DNA, including a request for the court to appoint their own DNA expert. *Cf. People v. Vargas*, 2024 Guam 1 ¶ 26 ("Reasonably competent counsel would

---

[12] The record is also silent on why trial counsel opted against calling any witnesses at all, offering any exhibits, or making a single objection throughout the entire trial.

have required its own [DNA] expert at an earlier stage to present a complete defense."). Because the record is not thoroughly developed on trial counsel's pretrial investigation of potential defenses and the reasoning behind his adoption of a defense strategy (to the extent there was one), we do not reach this issue on direct appeal.

[50] Although Narruhn faces a steep task in challenging counsel's trial tactics, the actions of trial counsel seem to hover on the outermost fringes of constitutional adequacy. We conclude it would be prudent to allow him to develop the record further in a collateral proceeding before a court decides whether he has met that high bar.

## C. We Are Troubled by the Handling of DNA Evidence in Recent Prosecutions of Micronesian Defendants, but We Conclude the Record Is Insufficient to Reach this Claim on Direct Appeal

[51] Narruhn argues that "it was imperative that Counsel moved to exclude, limit, or challenge, the DNA evidence that established Narruhn had intercourse with L.C." Appellant's Br. at 29. He claims that "[i]nstead, Counsel facilitated the People's case against Narruhn by stipulating . . . to Examiner Wright's expertise and to the admissibility and validity of Examiner Wright's report." *Id.* at 31-32. Narruhn is Chuukese, and the record shows that the DNA analysis performed in this case was done using a database with no samples from Chuukese individuals (or any genetically-related Micronesians). Troublingly, this is not the first case that has recently come before this court where potentially suspect DNA analysis has been utilized in the prosecution of a Micronesian defendant. *See People v. Riosen*, 2023 Guam 23 ¶¶ 12-13, 13 n.3 (discussing DNA analysis where original report was authored under incorrect assumption that Chuukese defendant was of Cherokee descent, and prosecution expert admitted larger sampling error because Chuukese database was "much smaller than the number of what we would normally use"). This raises the possibility that trial counsel stipulated to the admissibility of evidence that may have otherwise been inadmissible.

**[52]**     The Sixth Amendment requires that "counsel must, at a minimum, *conduct a reasonable investigation* enabling him to make informed decisions about how best to represent his client." *Turner v. Calderon*, 281 F.3d 851, 873 (9th Cir. 2002) (quoting *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994)).  Constitutionally adequate counsel would have at the very least performed cursory research before stipulating to the validity of damning DNA results four days before trial.  Such cursory legal research would have revealed that in *Commonwealth v. Aldan*, 2020 MP 20, the Supreme Court of the Commonwealth of the Northern Mariana Islands ("CNMI ") addressed a strikingly similar issue:

> The problem here is that the database used had representative samples from mainland U.S. ethnic groups, including self-identified African-Americans, Asians, Caucasians, Hispanics, and Native Americans, but zero known Pohnpeian or Micronesian samples.  The probability generated by [the prosecution expert's] database does not fit the facts of this case because the denominator does not reflect the relevant population.  In *United States v. Kootswatewa*, 2016 U.S. Dist. LEXIS 25936, 2016 WL 808663 (D. Ariz. 2016), the court held that testimony regarding Y-STR testing of a Hopi defendant was inadmissible under FRE 403 and potentially FRE 702 because the database used was not known to have any Hopi samples and "[w]ithout sound population frequency estimates, a jury cannot properly evaluate the weight" of the DNA evidence. . . .  The court held that testimony concerning Y-STR testing based on unrepresentative data was unreliable under 702 and, further its probative value was substantially outweighed by the risk of unfair prejudice under Rule 403.  The same problem is present here; the mismatch between the database and the CNMI creates a danger of a misleading statistical inference regarding the rarity of [the Pohnpeian defendant's] haplotype.

2020 MP 20 ¶ 16 (second alteration in original) (citations omitted).  The magnitude of the potential statistical errors that may result from using the wrong database in a Y-STR analysis may not be immediately apparent to a jury.  As the *Aldan* court explained, "Underrepresentation of persons of like ethnicity in the profile data bases . . . may inflate the odds against a random match with the defendant's sample.  In such a situation the jury may be ill-suited to discount properly the probative value of DNA profiling statistics."  *Id.* ¶ 17 (citation omitted).

**[53]**     Because Narruhn's trial counsel stipulated to the validity of the expert report, he failed to elicit whether the testing done in this case was Y-STR or autosomal. *See id.* ¶¶ 14-16 (holding Y-STR DNA evidence inadmissible in prosecution of Micronesian defendant because statistics were based on unrepresentative data). Trial counsel's cross-examination of the People's DNA expert raises doubts about whether they were aware of the differences between Y-STR and autosomal testing, and how the statistics are calculated for either test. However, on the record before us, we cannot definitively say what type of testing was done in this case.[13] If Y-STR testing was utilized in this case, trial counsel may have challenged the admission of the DNA evidence using persuasive authority like the CNMI's *Aldan* decision. But if another type of testing was used, the stipulation may have been entirely unproblematic. *See id.* ¶ 19.

**[54]**     We are deeply troubled by the imprecise handling of DNA evidence in recent prosecutions of Micronesian defendants, but we conclude the record is insufficient to reach this claim on direct appeal because it is unclear whether Y-STR testing was used and what investigation into the science and law was made by trial counsel before stipulating to the report. Narruhn is correct that "Ms. Wright gave damning testimony against [him]." Appellant's Br. at 33. But we cannot properly find on the record before us whether stipulating to the validity and admissibility[14] of Wright's report on the eve of trial was deficient.

//

//

---

[13] There is some indication in the record that additional notes from Wright were given to the prosecution and defense, but these notes are not part of the record. Tr. at 41 (Jury Trial, Sep. 13, 2023).

[14] Stipulating to the admissibility of an expert report also amounts to stipulating to the witnesses' qualifications as an expert. Wright testified that her qualifications included an MBA and BA in chemistry and biology. Although one need not have a PhD in genetics to provide expert testimony on DNA evidence, the question arises whether trial counsel had a strategic reason for not inquiring whether Wright was qualified to perform the complex statistical analysis that was done in this case. As discussed below, the assumptions and data used by Wright in this case may have been flawed. Unlike the People's expert in *People v. Riosen*, 2023 Guam 23 ¶¶ 12-13, who acknowledged these shortcomings and attempted to address them, Wright did not.

**D. The Record Is Insufficient on Narruhn's Other Claims**

[55]     Narruhn argues trial counsel's deficient performance is also illustrated by failing to file any substantive pretrial motions. He argues that reasonably competent counsel would have moved to suppress Narruhn's statements to police and to exclude expert and "quasi-expert" testimony. Appellant's Br. at 15, 27, 35. The U.S. Supreme Court has held that a failure to file a meritorious pretrial motion can constitute ineffective assistance. *Kimmelman*, 477 U.S. at 385. We conclude the record is insufficiently developed to reach the underlying merits of these claims.

[56]     The People claim pretrial discovery shows Narruhn was advised of his *Miranda* rights and waived them but concede this is not part of the record. Appellee's Br. at 21 n.2. Thus, the record is insufficiently developed for this court to make a finding on the meritoriousness of a motion to suppress. Additionally, the record is insufficiently developed for the court to determine whether failing to file motions to limit expert testimony or challenge their qualifications was a choice made "for strategic purposes [or] out of a lack of diligence." *See Damian*, 2016 Guam 8 ¶ 31.

[57]     It could have been strategic for the APD not to file a single evidentiary motion or make a single objection at trial, but such inaction is also consistent with a lack of diligence.[15] We conclude it is imprudent to assume diligence when faced with a record that reveals inaction by trial counsel with no explanation. The other alleged errors raised by Narruhn do not merit our discussion.[16]

---

[15] Narruhn also argues that trial counsel was ineffective for failing to object to prejudicial inadmissible hearsay and not objecting to any exhibit offered by the prosecution. For similar reasons, we conclude the record is insufficiently complete to make a finding on these alleged errors. It is possible that Attorney Santos had an unstated strategic purpose when he went the entirety of a four-day trial without lodging a single objection. But this inaction could also be consistent with a lack of diligence. *See Damian*, 2016 Guam 8 ¶ 31.

[16] Narruhn also challenges counsel's performance at sentencing (with particular emphasis on the pre-sentencing report), failure to move for acquittal on certain charges, and failure to poll the jury. Appellant's Br. at 40-42 (May 28, 2024). He cites no authority for the proposition that failure to poll the jury is deficient or prejudicial. Additionally, arguments similar to Narruhn's contentions about the pre-sentencing report were rejected in a prior decision of this court. *See People v. Meseral*, 2014 Guam 13 ¶ 57. To the extent Narruhn raises a claim of ineffectiveness regarding trial counsel's advocacy at sentencing independent of the pre-sentencing report, the record is insufficient. Finally, although it is "common practice" to make a motion for judgment of acquittal, any error is

Because ineffective assistance is the only issue raised on direct appeal and we are unable to conclude whether Narruhn received ineffective assistance, we affirm without prejudice to Narruhn's right to litigate his claim in collateral proceedings.

### E. We Have Appointed Habeas Counsel for Narruhn

[58]    Narruhn asks that "[i]f the Court determines the record is insufficiently developed to make a proper finding that Narruhn was denied his Sixth Amendment Constitutional and Organic right [to] counsel, it is respectfully requested that separate habeas counsel be appointed." Appellant's Br. at 42. The People argue, "There is no constitutional right to an attorney in state post-conviction proceedings"[17] and that "this court should decline to consider whether habeas counsel should be appointed at this juncture." Appellee's Br. at 38-40 (quoting *Coleman v. Thompson*, 501 U.S. 722, 754 (1991)).

[59]    Because we are deeply troubled with the performance of trial counsel, we conclude it is appropriate to appoint habeas counsel. The Indigent Defense Rule allowed this court the discretion to appoint counsel for an individual "facing loss of liberty," "seeking collateral relief from a judgment in a criminal matter," or "whose rights under the United States Constitution (or the

---

harmless if the motion would not have succeeded. *People v. Leon Guerrero*, 2001 Guam 19 ¶ 19. Because Narruhn does not challenge the sufficiency of the evidence on appeal, this appears to be a concession that he does not believe a motion for judgment of acquittal would have succeeded. And in any event, the trial court independently considered whether both the burglary and CSC charge should be submitted to the jury. *See* Tr. at 117 (Jury Trial, Sep. 13, 2023). Although these three claims illustrate trial counsel's general inactivity, none are independent grounds for reversal. We caution practitioners that they should not dilute meritorious claims with claims that are unsupported by authority, especially where cursory research reveals decisions of this court that go the other way. *See Reed v. Ross*, 468 U.S. 1, 16 (1984).

[17] The People are correct that, generally, no Sixth Amendment right to counsel attaches for indigents seeking post-conviction relief. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *see also* Appellee's Br. at 38-39 (quoting *Coleman v. Thompson*, 501 U.S. 722, 754 (1991)). However, the U.S. Supreme Court has suggested, without holding, that a prisoner may have "a right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." *Martinez v. Ryan*, 566 U.S. 1, 8-9 (2012) (citing *Coleman*, 501 U.S. at 755-56). The Fourteenth Amendment's Due Process Clause also provides for a right to counsel in certain post-conviction proceedings when "fundamental fairness necessitates the assistance of a trained advocate." *United States v. Palomo*, 80 F.3d 138, 141 (5th Cir. 1996). Because we conclude it would be appropriate to appoint counsel in this case, and neither party asks us to extend the Supreme Court's dicta in *Martinez*, we need not determine whether there is a right in all cases.

Organic Act) may be substantially infringed without the appointment of counsel." Local Rules of the Superior Court of Guam, Miscellaneous Rule ("MR") 1.1.1(B)(2), (3).[18] This court has considered the issues raised and has exercised its discretion to appoint counsel to represent Narruhn. Attorney Peter C. Perez has been appointed as counsel for Narruhn to file and litigate a petition for a writ of habeas corpus.

## V. CONCLUSION

[60]     Although our review raises concerns, the record is not complete enough to determine whether trial counsel failed to investigate and present a defense strategy. The right to counsel is granted to both the innocent and the guilty. The record, although incomplete, generally indicates inactivity by trial counsel during critical stages of Narruhn's prosecution. We cannot make definitive findings based on the current record, but we are deeply troubled by what our review reveals. Therefore, we have appointed Narruhn habeas counsel with instructions to file a writ of habeas corpus in the Superior Court. We **AFFIRM WITHOUT PREJUDICE** to Narruhn's right to raise the ineffective assistance of counsel issue in a habeas corpus proceeding.



| /s/ | /s/ |
| :---: | :---: |
| F. PHILIP CARBULLIDO | KATHERINE A. MARAMAN |
| Associate Justice | Associate Justice |

/s/
ROBERT J. TORRES
Chief Justice

---

[18] With the enactment of Public Law 38-48 ("Public Defender Service Corporation Act of 2025"), administration of the Private Attorney Panel was transferred to the Public Defender Service Corporation ("PDSC"), effective October 1, 2025. This rendered MR 1.1.4 without effect after September 30, 2025. With the exception of certain portions of the former MR 1.1.4 and 1.1.5 that relate to the appointment of and compensation for court interpreters, the substance of the Indigent Defense Rule was repealed effective October 1, 2025. Promul. Order No. 06-006-30 (Sep. 26, 2025). Our order appointing counsel was issued before the effective dates of the Public Defender Service Corporation Act of 2025 and our repeal of the Indigent Defense Rule.